IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO.: 4:19-cv-00030-BO

| | | |
|---|---|---|
| STAN C. STANLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW** |
| vs. | ) | **IN SUPPORT OF** |
| | ) | **DEFENDANT'S MOTION** |
| UNIVERSAL CABLE HOLDINGS, INC. | ) | **FOR SUMMARY JUDGMENT** |
| d/b/a SUDDENLINK COMMUNICATIONS, | ) | |
| | ) | |
| Defendant. | ) | |

**COMES NOW** Defendant Universal Cable Holdings, Inc. d/b/a Suddenlink Communications ("Suddenlink," the "Company" or "Defendant"), by and through its undersigned counsel, and offers this memorandum in support of its Motion for Summary Judgment seeking dismissal of Plaintiff's sole remaining claim: a Title VII retaliation claim.

Here, Plaintiff was terminated after the Company conducted a thorough investigation and concluded there was reasonable suspicion to believe that Plaintiff shared confidential Company information with a former employee who was now working for a competitor. As explained herein, the pleadings, discovery materials, and other evidence of record demonstrate that there is no genuine issue as to any material fact, and Suddenlink is entitled to judgment as a matter of law. Accordingly, Suddenlink's Motion for Summary Judgment [DE # 39] should be GRANTED, and this action should be DISMISSED WITH PREJUDICE.

## NATURE OF THE CASE.

Plaintiff filed this action on March 1, 2019, alleging three Title VII claims: a disparate treatment claim based on gender; a hostile work environment claim; and a retaliation claim. [DE # 1] On April 20, 2020, Suddenlink filed Partial Motion to Dismiss [DE # 10], seeking dismissal

of the discrimination and hostile work environment claims. By Order dated July 3, 2019 [DE # 19], this Court granted the Partial Motion to Dismiss. Pursuant to the Order, the sole remaining cause of action is a Title VII retaliation claim. Defendant now seeks dismissal of this claim.

## STATEMENT OF FACTS

Suddenlink is a subsidiary of Altice USA which specializes in cable television, high-speed internet, broadband phone, home security, and advertising for residential and commercial customers. [Arbaugh Decl. ¶ 4] Suddenlink has several facilities in North Carolina, including a location in Greenville, North Carolina, where Plaintiff worked. [Stanley 43:4-10]

Plaintiff began working with a predecessor of Suddenlink on July 9, 2001. [Arbaugh Decl. ¶ 5] In February 2008, Plaintiff became a sales engineer—a position he held until his termination. [Arbaugh Decl. ¶ 6; Exhibit 1] As a Sales Engineer, Plaintiff performed a variety of duties, including accompanying Account Executives on sales visits; assisting Account Executives with developing proposals; and acting as liaison between engineering and sales in determining costs and profitability of proposed projects. [Arbaugh Decl. ¶ 6; Exhibit 6] Plaintiff reported to Sam Smith who was located in Texas, and Smith reported to Jose Lugo in New York. [Arbaugh Decl. ¶ 7]

In February 2015, Suddenlink hired Tracy Fryer Williams ("Williams") as an Account Executive in Greenville, North Carolina. [Arbaugh Decl. ¶ 8] At the time of her hire, she was supervised by Michael Tarrant ("Tarrant"). [Arbaugh Decl. ¶ 9] Other Account Executives in Greenville whom Tarrant supervised included Sherry Cooper ("Cooper"),[1] Casey Bailey ("Bailey"), and Aaron Penny ("Penny"). [Arbaugh Decl. ¶ 10] The Account Executives relied

---

[1] Sherry Cooper is also sometimes referred to as Sherry Turner.

on Plaintiff and Chris Manning ("Manning"), Project Development Manager, for sales support. [Autry Decl. ¶ 6]

Plaintiff testified he was instructed to spend 70% of his time with Williams in order to provide assistance to her as the new Account Executive and that this directive appeared in his performance evaluation.[2]  [Stanley 52:2-4]  Later, co-workers began making comments related to Williams' close working relationship with Plaintiff and questioned why Plaintiff was Williams' "personal sales engineer."  [Stanley 51:14-15]

By all accounts, Williams had difficulty while employed with Suddenlink.  Over the course of her employment, Williams made multiple complaints with Human Resources regarding her treatment in the Greenville office.   Specifically, Williams complained that her co-workers and supervisor did not like her and that she was "bullied" and "harassed" by them.  [*See, e.g.*, Arbaugh Decl. ¶ 11; Exhibits 3-6] She also complained that accounts were stolen from her and sales leads were unfairly distributed.  [*Id.*]  Williams did testify that Tarrant would ask her "personal things" such as whether she was dating anyone and on one occasion, whether she had ever dated a married man.  [Williams 73:8-74:16]  When Plaintiff found out about these comments, he encouraged Williams to report them to Human Resources.  [Stanley 95:6-96:2] Plaintiff admitted he did not report this conduct to Human Resources.  [Stanley 96:10-12]

For his part, Plaintiff testified he complained in May 2015 to Tarrant that Cooper and Bailey were "harassing" Williams.  [Stanley 72:24-73:10] Plaintiff testified he reported that Cooper and Bailey were making "ugly" comments about Williams being a "stupid fucking bitch" who did not know how to sell.  [Stanley 75:16-76:2]  After this initial complaint, Plaintiff continued to report to Tarrant issues involving Cooper and Bailey's treatment of Williams, including them

---

[2] No such directive appeared in his 2014 or 2015 performance evaluation.  [Arbaugh Decl. ¶ 14; Exhibits 8 and 9]

trying to take work from Williams in Salesforce, a program used to manage sales and leads. [Stanley 79:3-9] He also shared that Cooper and Bailey made a lot of "not very nice, not positive statements" about Williams that was just "really stupid stuff" and not sexual harassment. [Stanley 79:10-80:6; 81:9-13]

Despite Williams' multiple complaints, Human Resources personnel, for the most part, found her complaints to be unsubstantiated. For example, in the Investigative Report completed by Patty Brooke on January 2, 2017, she found "there seems to be unprofessional comments from [Williams, Cooper, and Bailey] that need to be addressed." [Arbaugh Decl. ¶ 11; Exhibit 6] Brooke recommended that "leadership set professional expectations to the team and possibly look at the individuals on the team complete a civil treatment for employee's training." [Id.]

As part of the investigation of Williams' complaints, Plaintiff was interviewed by Human Resources. [Stanley 24:9-25:17; 69:1-10] Plaintiff testified that as a result of his "support" of Williams, he suffered alleged retaliation which included: others making unprofessional comments about him behind his back; being excluded from sales meetings; keeping him from going on sales calls; and having his office moved. [Stanley 69:11-17; 85:6-89:18] Plaintiff admitted he was not terminated after any of these interviews with Human Resources. [Stanley 31:12-19] In fact, Plaintiff did not receive any sort of disciplinary action and his pay was not reduced following his participation in these investigations. [Arbaugh Decl. ¶ 15]

Both Plaintiff and Williams admitted that Manning was treated similarly to Plaintiff. For example, Manning's office was moved, he was excluded from sales meetings, and he was not asked to go on sales calls. [Stanley 87:4-19, 106:10-107:9; Williams 68:10-69:10, 99:6-25] According to Williams, Tarrant moved Plaintiff and Manning's offices to allow the sales team to have better access to Plaintiff and Manning. [Williams 64:1-9]

4

Ultimately, Williams' employment was separated after she failed repeatedly to meet her sales quota month over month. [Arbaugh Decl. ¶ 12] On April 5, 2017, Williams filed an EEOC Charge alleging retaliation "for complaining about unprofessional conduct and database irregularities." [Arbaugh Decl. ¶ 13; Exhibit 7]. Eight days later, the EEOC dismissed this Charge of Discrimination with a no cause determination on April 13, 2017. [Williams Depo.; Exhibit 8] The following month, Williams began working for CenturyLink, a direct competitor of Suddenlink, as a sales executive for new business in eastern North Carolina. [Williams 30:4-15]

After Williams' termination, Plaintiff admitted that the alleged retaliation abated somewhat although he contended, he was still excluded from sales calls and required to submit new reports to his supervisor. [DE # 1, ¶ 38]

## A.    The August 25, 2017 Call.

Plaintiff requested a call (the "Call") on Friday, August 25, 2017, to discuss a bid for Beaufort County Schools ("BCS"). [Stanley 27:2-13; 28:23-24] BCS had published a request for proposals ("RFP") from service providers for an E-Rate project for the school system. [Autry 76:4-77:4] This E-Rate proposal was one of the most complex and competitive opportunities Suddenlink would compete for on a yearly basis. [Autry 77:6-81:22] The purpose of the Call was to discuss project costs so Plaintiff could calculate the initial rate of return ("IRR") for the project. [Stanley 28:7-20] Dedric Staton, a Suddenlink employee, set up the call using Microsoft Lync ("Lync"), a software program Suddenlink used to organize and manage participation in conference calls. [Stanley 29:6-9; Autry 67:14-24] The Lync program permits invitees to participate either by using a dial-in number and conference code, or by connecting through the Lync website via an online link. [Autry 64:13-23] All attendees invited to the Call were Suddenlink employees. [Autry Decl. ¶ 8]

5

At the beginning of the Call, the leader called the roll to confirm attendees. [Arbaugh Decl. ¶ 17; Exhibit 10] When roll was taken, Penny noticed Plaintiff did not initially respond when his name was called. [*Id.*] Manning, another attendee on the Call, whose cubicle was near Penny's, separately called Plaintiff (who was not in the office at the time) to ensure his attendance on the Call. [Stanley 29:13-19] When Plaintiff answered his phone, he told Manning his phone was dying, but he would jump on the call. [*Id.*] Plaintiff then got into his vehicle, plugged in his phone, called into the call, and drove to the office where he went to Manning's office to complete the call. [*Id.*]

While Manning was on speakerphone with Plaintiff asking Plaintiff to join the call, Cooper overheard the conversation. [Arbaugh Decl. ¶ 18; Exhibit 12] She walked over to Penny's desk where she looked at the computer which showed the individuals called into the call. [*Id.*] She saw Williams' name as being a participant on the Call. [*Id.*]

After the Call, both Cooper and Penny reported to their supervisor, John Autry,[3] that they had observed Williams' name on the conference bridge. [Arbaugh Decl. ¶ 18; Exhibits 11 and 12]. Autry requested that both Cooper and Penny give him a written statement outlining what they had witnessed. [Arbaugh Decl. ¶ 19; Exhibit 13] Once Autry received the statements, he reported the information to his supervisor, Michael Shaffer. [Autry 91:22-92:3] Even though he had never dealt with a situation like this before, Autry felt obligated to report the incident because the purpose of the Call was to discuss confidential and proprietary trade secret information on how to respond to the Beaufort County Schools E-Rate RFP—a very competitive process. [Autry 94:12-97:1]

---

[3] Tarrant's employment was separated in or about August 2016. [Arbaugh 79:8-80:9] Autry then became the Regional Sales Manager. [Autry 24:8-16]

On Monday August 28, Smith received an email from Steve Tulloh, Shaffer's supervisor, requesting that Smith obtain information from Plaintiff related to the August 25 Call. [Arbaugh Decl. ¶ 17; Exhibit 10] After receiving the email, Smith contacted Plaintiff to speak with him regarding the Call. [*Id.*] During this conversation, Plaintiff revealed for the very first time that Penny had sent him an "inappropriate" video (the "Images") to his work cell phone a week earlier on August 21. [*Id.*; Stanley 147:19-148:9; Arbaugh Decl. ¶ 23; Exhibit 15]. Smith questioned why Plaintiff had not reported this immediately as required by Company policies. [Arbaugh Decl. ¶ 17; Exhibit 10] Plaintiff indicated he had just noticed the video and thought someone else would have reported it. [*Id.*] Upon receipt of this complaint from Plaintiff, Smith reported this information to Lugo, his supervisor, who escalated the issue up to Human Resources. [Lugo 24:15-27:22] In addition to reporting the Images to his supervisor, Plaintiff also reached out to Penny's supervisor, Autry, to report that Penny had shared inappropriate materials with him and that he was going to report this to HR. [Autry 162:2-20]

Eventually, Duska Arbaugh, Regional Director of Human Resources, was tasked with investigating: (1) the August 25 Call; and (2) Plaintiff's complaint about the Images. [Arbaugh 17:14-16; Arbaugh Decl. ¶¶ 16 and 23] As described below, these investigations were separate and distinct. Each will be discussed in turn.

**B.      The sexual harassment complaint.**

Ultimately, the investigation of the sexual harassment complaint about the Images proved to be fairly simple because Penny acknowledged sending the Images to Plaintiff. On August 30, 2017, Autry, Penny's direct supervisor, spoke with Penny concerning Plaintiff's allegation that Penny shared the Images with Plaintiff on August 21, 2017. [Autry 166:7-13; Arbaugh Decl. ¶ 24; Exhibit 16] Penny indicated he had received a video from a friend (not a Suddenlink employee)

titled "Eclipse." [*Id.*] Penny admitted to showing the video to Manning and Plaintiff on the morning of August 21, 2017. [*Id.*] Penny stated that he, Plaintiff, and Manning often willingly shared "Adult Humor" among themselves, and that Penny had been the recipient of similar material from Plaintiff in the past. [*Id*] When Penny showed the Eclipse video to Plaintiff, Plaintiff said the video was "hilarious" and asked Penny to send it to him so he could share it with his son. [*Id.*] When Penny asked for Plaintiff's personal cell phone number, Plaintiff instructed Penny to send the Images to his work cell phone. [*Id.*] Penny admitted sending the video to Plaintiff's work phone. [*Id.*] Penny further acknowledged his behavior was inappropriate and committed to not participating or being involved in the type of behavior moving forward. [Arbaugh Decl. ¶¶ 24 and 25; Exhibit 17; Exhibit 16] Autry sent Arbaugh an email summarizing his discussion with Penny. [Autry 162:2-13; Arbaugh Decl. ¶ 24; Exhibit 16] As part of the investigation of this complaint, Arbaugh spoke with Plaintiff about his allegations. [Arbaugh 96:9-97:3]

Following the investigation, Penny received a corrective action for sharing inappropriate material in the workplace. [Arbaugh Decl. ¶ 25; Exhibit 17; Arbaugh 97:2-3] Plaintiff did not receive any disciplinary action in connection with these events. [Arbaugh Decl. ¶ 26]

### C.   The investigation of the Call.

While the investigation of the Images was straightforward, the investigation of the Call was more involved and time-consuming. As part of the investigation, Arbuagh pulled company cell phone records for each attendee from August 4, 2017 through August 30, 2017. [Arbaugh Decl. ¶¶ 20, 22; Exhibit 14] Based on these records, only Plaintiff's call log could be tied to Williams' personal cell phone and land line. [*Id.*] When Arbaugh analyzed these records, she found that Plaintiff and Williams had a total of 889 minutes of talk time with each other over a two-week period. [*Id.*] In fact, Plaintiff and Williams talked on three separate occasions on the

8

day of the call. [*Id.*] Despite this evidence, Arbaugh did not limit her investigation to cell phone records. [*Id.*] She also requested email and Instant Message ("IM") searches, badge swipe information, and explored whether the Company could verify Plaintiff's location through GPS information. [Arbaugh Decl. ¶¶ 21, 22; Exhibit 14] In addition, Arbaugh collected information pertaining to the numbers that dialed into the meeting and confirmed as part of her investigation that a call did come in from Williams' home land line. [Arbaugh 107:23-108:3; 119:7-21] At her deposition, Williams admitted that she had a telephone landline at this time although she professed to be unable to remember the number. [Williams 12:8-15]

After gathering this documentation, Arbaugh conducted one-on-one interviews of attendees on the Call. [Arbaugh 109:23-12] Of the individuals interviewed, Plaintiff was the only attendee who admitted to having an outside relationship with Williams. [Arbaugh Decl. ¶ 22; Exhibit 14] When Arbaugh asked Plaintiff if he spoke to Williams on the day of the Call, he indicated he was not sure but "maybe." [*Id.*] Arbaugh then shared Plaintiff's cell records reflected he spoke to Williams in the morning, in the afternoon before the Call, and later in the evening for a total of 74 minutes that day. [*Id.*] When Arbaugh asked where he was during the Call, Plaintiff said he was parked in his driveway on his cell phone. [*Id.*] During the interview, Plaintiff stated that he knew how "it looked," but he did not give Williams the number for the call. [*Id.*]

Based on this investigation, Arbaugh prepared a report which in which she concluded there was reasonable suspicion to believe that Plaintiff either provided the call-in number to Williams or that Plaintiff was with Williams during the Call. [*Id.*] The evidence of the investigation led her to believe Plaintiff's relationship with Williams posed a risk of Suddenlink's proprietary information being leaked or shared with a direct competitor. [*Id.*] Given this significant risk,

9

Arbaugh recommended that Plaintiff be terminated. [*Id.*] Suddenlink terminated Plaintiff's employment relationship on September 28, 2017. [Stanley 20:21-23]

### D. The EEOC Charge.

Following his termination, Plaintiff filed a Charge of Discrimination on October 3, 2017, alleging discrimination on the basis of sex, age and retaliation. [DE # 1-1] In his Charge, Plaintiff alleged the following:

> Approximately seven months before my discharge, I participated in an internal investigation. At that time, the Human Resources Investigator asked me to be forthright with any information I had, and I was. Among other things, I stated Mr. Penny and John Autry sexually harassed the complainant as well as other females. I provided specific examples of them saying that they wanted to "fuck" the complaint [sic] and would talk about her "ass." The Investigator soon after disclosed to the harassers and others what I had disclosed in confidentiality [sic]

[DE # 1-1] The EEOC issued a Dismissal and Notice of Rights on December 3, 2018, and Plaintiff filed this action on March 1, 2019. [DE # 1]

## ARGUMENT

### I. The Applicable Standard of Review.

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007). Although the Court must construe facts in the light most favorable to Plaintiff, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50). "[A] party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence." *Pronin v. Johnson*,

628 F. App'x 160, 161 (4th Cir. 2015) (per curiam) (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).

## II.    <u>Plaintiff's Retaliation Claims Fails.</u>

To state a Title VII retaliation, Plaintiff must show: (1) he engaged in protected activity; (2) Suddenlink took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the adverse employment action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Only those retaliatory actions which are "materially adverse"—such that they "might have dissuaded a reasonable worker" from engaging in protected activity—are actionable. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Thompson v. N. Am. Stainless, LP* 562 U.S. 170, 174, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011) (reaffirming same).

Retaliation may be shown through direct evidence or by utilizing the *McDonnell Douglas* burden-shifting framework. *Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir. 1997). If Plaintiff can establish a prima facie case, Suddenlink must then "articulate a legitimate, non-retaliatory justification." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Suddenlink's burden "is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Suddenlink can meet it by "offering admissible evidence sufficient for the trier of fact to conclude" that the proffered legitimate, non-retaliatory reason was the actual reason for the adverse action. *Id.* If Suddenlink makes this showing, the burden then shifts back to Plaintiff to show that the stated reason was pretextual and that retaliation was the "actual reason" for the materially adverse action. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253-54 (4th Cir. 2015). Stated another way, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *University of Tx. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 362 (2013) (emphasis added). The ultimate burden of persuasion remains with Plaintiff *at all times. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 508 (1993).

A.    **The Alleged Protected Activity.**

Plaintiff claims he engaged in protected activity by: (1) participating in Suddenlink's investigation into complaints of discrimination and harassment made by Williams; (2) reporting discrimination and retaliation by Cooper, Bailey, and Tarrant against him; and (3) reporting sexual harassment by Penny. [DE # 1, ¶¶ 64-66]. Suddenlink concedes Plaintiff engaged in legally protected activity when he reported receiving the Images from Penny. For the reasons that follow, only this report of alleged sexual harassment by Penny can be considered legally protected activity to support Plaintiff's Title VII retaliation claim.

1.    **Participation in investigation of Williams' Complaints is not protected activity.**

Plaintiff did not engage in protected activity when he "participated" in Suddenlink's investigation of Williams' complaints. [DE # 1, ¶ 64] First, Plaintiff's participation in an internal investigation is not protected activity for purposes of Title VII's participation clause. Title VII participation activities are those outlined in the statute: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "Participation" activities include reports through official channels and participation in formal investigations within "the machinery set up by Title VII." *Id.*; *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir. 1999). Internal investigations do not meet this requirement as "the EEOC process must have commenced in order for an employee to claim protection under the participation clause." *Winslow v. Locke*, Civ. No. DKC-09-0071, 2010 WL 1141200, at *6-7 (D.

12

Md. Mar. 22, 2010) (collecting cases that "held that the participation clause has no application in the context of an internal investigation where an EEOC complaint has not been filed.").

Here, Suddenlink's investigation of Williams' complaints took place prior to Williams' termination. Williams did not file her EEOC Charge until after her employment was separated. [Arbaugh Decl. ¶ 13; Exhibit 7; Williams 80:8-22]. Accordingly, there was no ongoing investigation, proceeding, or hearing in which Plaintiff could participate at the time he participated in Suddenlink's investigation of Williams' complaints that could conceivably fall under the protection of the participation clause. *Laughlin*, 149 F.3d at 259; *see also Johnson v. Portfolio Recovery Assocs., LLC*, 682 F.Supp.2d 560, 583 (E.D.Va. 2009) ("Plaintiff's participation in any asserted internal investigation by Defendant prior to termination is not protected activity under the participation clause because any such asserted internal investigation must have occurred prior to, and therefore unrelated to, the filing of any EEOC charge").

Second, because Williams' complaints did not involve any complaints of alleged violations of Title VII, Plaintiff could not have engaged in protected activity by "participating" in any internal investigation of her complaints. Williams complained about bullying and unfair treatment. [*See, e.g.*, Arbaugh Decl. ¶ 11; Exhibits 3-6] She also complained that accounts were stolen from her and sales leads were unfairly distributed. [*Id.*] Even if true, none of these complaints implicate Title VII as evidenced by the EEOC's dismissal of Williams's EEOC Charge within eight days of filing. [Arbaugh Decl. ¶ 13; Exhibit 7 and Williams Depo.; Exhibit 8, Plaintiff 000227] Further, "[g]eneral complaints of unfair treatment are not protected activity." *Id.* (citing *Romeo v. APS Healthcare Bethesda, Inc.*, 876 F. Supp. 2d 577, 587 (D. Md. 2012)). Thus, Williams complaints about bullying, unfair treatment, and unfair distribution of accounts are not legally protected activity.

13

Admittedly, Williams did testify that Tarrant would ask her "personal things" such as whether she was dating anyone and on one occasion, whether she had ever dated a married man. [Williams 73:8-74:16] Such comments, even if true, cannot constitute actionable sexual harassment because they were not severe or pervasive enough to alter the terms and conditions of Williams' employment. *See, e.g., Faragher v. Boac Raton*, 524 U.S. 775, 788 (1998) (noting that "simple teasing offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

Even if these comments did constitute actionable harassment, Plaintiff admitted that even though he advised Williams to report these comments to Human Resources, he never reported them to Human Resources. [Stanley 95:6-96:12]. Accordingly, even if Tarrant's behavior were true, it cannot be used as evidence of Plaintiff's alleged protected activity because he—by his own admission—never shared this information with his employer, and therefore, never engaged in protected activity in connection with it. *See Dowe v. Total Action against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[B]y definition, an employer cannot take action because of a factor of which it is unaware.").

    2.    **Plaintiff's alleged reports of discrimination and retaliation by Cooper, Bailey, and Tarrant are not protected activity.**

Plaintiff further alleges he engaged in protected activity when he reported discrimination and retaliation by Cooper, Bailey, and Tarrant against him. Plaintiff's retaliation claim premised upon this theory likewise fails.

    a.    **Plaintiff did not exhaust his administrative remedies as to this claim.**

"Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d

124, 132 (4th Cir. 2002) (citation omitted). The contents of the charge determine the scope of the plaintiff's right to file a federal lawsuit. *Id.* (citation omitted). The boundaries of a subsequent lawsuit are restricted to: (1) discrimination claims stated in the initial charge; (2) those reasonably related it; (3) and those developed by reasonable investigation of the charge. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005); *Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863-64 (4th Cir. 1982) (holding that claim of discriminatory failure to rehire was barred for failure to exhaust because the administrative charge alleged illegal layoff only); *Taylor v. Va. Union Univ.*, 193 F.3d 219, 239 (4th Cir. 1999) (en banc) (holding plaintiff had not exhausted administrative remedies when the factual allegations of after-hours phone calls and touching were too inconclusive to suggest sexual harassment). Where the charge references "different time frames, actors, and discriminatory conduct than the central factual allegations in [plaintiff's] formal suit," it fails to exhaust the claim. *Chacko*, 429 F.3d at 506; *See also Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001) ("[T]he EEOC charge and the complaint must, at a minimum, describe the same conduct and implicate the same individuals.").

"The Fourth Circuit takes a narrow approach to determining if claims are 'reasonably related' to or 'developed by reasonable investigation of' the original complaint." *Tran v. Norvo Nordisk Pharm. Indus.*, NO. 5:14-CV-FL, 2016 U.S. Dist. LEXIS 51623, *34 (E.D.N.C. 2016). The Court is not "at liberty to read into administrative charges allegations they do not contain." *Balas v. Huntingon Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013); *Manning v. Foodarama, Inc.*,195 F.Supp.2d 741 (D. Md. 2002) (dismissing failure to promote claim not raised in EEOC Charge); *Riley v. Technical and Management Services Corp.*, 872 F.Supp. 1454 (D. Md. 1995) (granting summary judgment for employer on sexual harassment claim where there was no mention of sexual harassment in the EEOC Charge).

In *Chacko*, the plaintiff alleged three acts of supervisor harassment in his charge but, in litigation, he asserted claims his co-workers engaged in national-origin-based harassment focused on the use of epithets. *Chacko*, 429 F.3d at 509. In holding plaintiff had not exhausted his administrative remedies, the Fourth Circuit concluded "a reasonable investigation of discrete instances of supervisor misconduct not involving name calling could not have been expected to lead to a continuous pattern of nonsupervisory misconduct which did involve name calling." *Chacko*, 429 F.3d at 512.

Here, Plaintiff's EEOC Charge referenced only two potential theories of protected activity: (1) his report of alleged sexual harassment in August 2017; and (2) his participation in an internal investigation involving complaints by Williams "[a]pproximately seven months" before his termination. [DE # 1-1] Plaintiff's EEOC Charge did not contain any allegations Plaintiff engaged in protective activity when he allegedly "reported discrimination and retaliation by Cooper, Baily, and Tarrant against him." [DE # 1, ¶ 65] A plain reading of Plaintiff's EEOC Charge confirms he did not include any allegations about this alleged protected activity prior to filing his lawsuit. Allowing Plaintiff to proceed on this theory would defeat the very purpose of the administrative exhaustion requirement—notice and conciliation—if he could now pursue this theory of retaliation despite the Charge's absolute silence as to them. *Chacko*, 429 F.3d at 510.

Further this new theory of protected activity was not reasonably related to his claims in the EEOC Charge or claims that could have been developed by reasonable investigation of the Charge. As *Chacko* makes clear, factual allegations made in formal litigation must correspond to those set forth in the administrative charge and cannot be manufactured out of whole cloth. *Chacko*, 429 F.3d. at 509. Here, an investigation into whether Plaintiff was retaliated against for participating in an investigation into a co-workers complaints would not reasonably lead to an

16

investigation of whether Plaintiff was retaliated against for complaining about his own alleged unfair treatment. Plaintiff's new theory of protected activity does not appear within the four corners of his EEOC Charge, and his failure to include this claim in his EEOC Charge prevents him from now seeking recovery for this alleged claim. Accordingly, Plaintiff cannot pursue a claim premised upon alleged protected activity involving his alleged reports of discrimination and retaliation by Cooper, Bailey, and Tarrant against him.

> **b.** **To the Extent Plaintiff's claims are premised upon conduct that occurred more than 180 days prior to the filing of his EEOC Charge these claims should be dismissed as untimely.**

Further, Plaintiff's newest theory of retaliation (i.e., his alleged reports of discrimination and retaliation against him by Cooper, Bailey, and Tarrant) must still be dismissed as it is time-barred to the extent it is premised on alleged conduct that occurred, if at all, more than 180 days before he filed his Charge with the EEOC. See 42 U.S.C. § 2000e-5(e). Before a plaintiff may file suit under Title VII, he is required to file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice. See 42 USCA § 2000e-5(f)(1). Failure to timely file a charge with the EEOC bars the claim in federal court. *McCollough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994).

Plaintiff filed his Charge with the EEOC on October 3, 2017. Thus, Charging Party's claims arising from any allegedly retaliatory conduct that occurred prior to April 6, 2017, are untimely and should be dismissed. *See Jenkins v. Trustees of Sandhills Cmty. Coll.*, 259 F.Supp.2d 432, 441 (M.D.N.C. 2003) (dismissing pro se plaintiff's Title VII claims regarding incidents in her EEOC charge occurring outside of the 180-day prescribed period).

Here, all of the alleged conduct related to this new theory of protected activity occurred well before April 6, 2017. Plaintiff admits that after Williams was terminated on February 7, 2017,

most of the alleged retaliation abated as he was "permitted to participate in some sales meetings and related telephone conferences." [DE # 1, ¶ 38]. Accordingly to the extent that the alleged retaliatory conduct occurred well prior to April 6, 2017, Plaintiff cannot now pursue those claims as they are untimely and time-barred.

Further, Plaintiff never indicated on his Charge he was pursuing any of his claims on a continuing violation theory as he did not check the box for "continuing action." [DE # 1-1] Instead, Plaintiff indicated the earliest alleged act of discrimination occurred on August 28, 2017, and the last act occurred on September 28, 2017. By failing to indicate he was pursuing claims based on a continuing violation theory, he is now judicially barred from pursuing them. *Thornton v. Dept. of Pub. Safety and Correctional Services*, 2017 U.S. Dist. LEXIS 133005 at * 25 (noting the "task of checking boxes is not onerous" and plaintiff did not check the "continuing action" box on the Charge"); *Byington v. NBRS Fin. Bank*, 903 F. Supp. 2d 342, 350 (D. Md. 2012) (finding plaintiff failed to exhaust her administrative remedies as to discrimination on the basis of age because she "did not check the box for discrimination based on age, and there is no reference to age discrimination in the narrative portion of the document"); *Talbot v. Foodservice, Inc.*, 191 F. Supp. 2d 637, 640 (D. Md. 2002) (same, for disability discrimination). Thus, Plaintiff cannot rely on a continuing violation theory to support his retaliation claim.

c.    **Plaintiff's complaints about his own treatment were not protected activity.**

Even if Plaintiff's newest theory of retaliation was not time-barred, it must still fail. In order to be protected activity, Plaintiff must have opposed conduct prohibited by Title VII. For an employee's activity to constitute protected "opposition," he must show (1) he reasonably believed that the employment action he opposed constituted a Title VII violation, *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) (en banc), and (2) his conduct in opposition

18

was reasonable, *see Laughlin*, 149 F.3d at 259-60. As the Supreme Court has made clear, Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington Northern*, 548 U.S. at 68.

Here, Plaintiff testified that after he participated in McKittrick's investigation, Tarrant, Cooper, and Bailey began harassing him. [Stanley 85:6-88:20] This "harassment" included making comments such as "stupid fucker" and snickering when he would walk by. [Stanley 85:6-22] The harassment also included being excluded from weekly sales meetings conducted by Tarrant and being excluded from customer meetings. [Stanley 85:6-89:18] This conduct, even if true, constitutes petty slights and minor annoyances that are not actionable under Title VII. *Thorn v. Sebelius*, 766 F.Supp.2d 585, 603 (D. Md. 2011), aff'd, 465 Fed.Appx. 274 (4th Cir. 2012). Plaintiff acknowledged as much when he admitted that Cooper, Bailey, or Tarrant did *not* sexually harass him. [Stanley 94:25-95:3] Thus, even if Plaintiff complained about his treatment by Cooper, Bailey, and Tarrant, it cannot constitute protected activity because the alleged conduct is not prohibited by Title VII.

      **B.**    <u>**The Alleged Adverse Actions.**</u>

To survive summary judgment, Plaintiff must demonstrate that he suffered an adverse employment action. Suddenlink concedes that termination is the ultimate adverse employment action. In addition to his termination, Plaintiff complains about other retaliatory conduct which occurred as a result of his "support" of Williams. Specifically, he claims he sustained adverse employment actions when he was subjected to others making unprofessional comments about him behind his back; excluding him from sales meetings; being kept from going on sales calls; and having his office moved. [Stanley 69:11-17; 85:6-89:18] This conduct, however is insufficient to constitute adverse employment actions for purposes of Title VII.

Under Title VII, an adverse action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In order to be considered "adverse" for purposes of a retaliation claim, the employment action must be one that a "reasonable employee would have found ... materially adverse" such that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 68 (citation and quotation marks omitted). The "material adversity" requirement is necessary to "separate significant from trivial harms," and the "significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 68-69.

As "evidence" of alleged retaliation Plaintiff claims that he was removed from meetings, kept from going on calls, and moved out of his office." [DE # 1, ¶¶ 22-24] These actions, even if true, are clearly insufficient to rise to the level of a "materially adverse" action. *See Evans v. Intern. Paper Co.*, 936 F.3d 183, 196 (4th Cir. 2019) (finding that being ignored and left out of meetings is the type of "petty slights or minor annoyances" that are not actionable retaliation); *Thorn*, 766 F.Supp.2d at 603 (holding that retaliatory emails, a change in plaintiff's tour of duty, an instruction to an employee not to work with plaintiff, unwarranted reprimands, and exclusion from a work project were not actionable adverse employment actions); *Tawwaab v. Va. Linen Serv., Inc.*, 729 F.Supp.2d 757, 784-85 (D. Md. 2010) ("[A] change in job responsibilities …[and] insistence that [plaintiff] perform arbitrary and time-consuming tasks, does not constitute a materially adverse action if the new tasks are not dirtier, more arduous, less prestigious, ... objectively inferior, [or] possess[ing] [of] any analogous attribute."); *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F.Supp.2d 500, 515 (D. Md. 2011) (plaintiff's allegations that "he was yelled at

for complaining about his discriminatory treatment" and that "the school threatened to officially reprimand him if he sent more complaining e-mails to administrators" were not materially adverse employment actions). All of the retaliatory actions about which Plaintiff complains—save his termination—"amount to nothing more than unactionable 'personal slights.'" *See Thorn*, 766 F.Supp.2d at 603. Even if such conduct were actionable—which it is not, Plaintiff admits that most of the alleged retaliatory conduct eventually stopped after Williams was terminated. [DE # 1, ¶ 38]

Moreover, Plaintiff has not alleged any retaliatory action which was imposed by his supervisor or his employer (save for the termination). *See generally* Complaint. Instead, the alleged retaliatory actions about which he complains were committed by peers and co-workers (i.e., Cooper, Bailey and Tarrant) in the Greenville office. None of these employees had any direct supervisory control over him. [Arbaugh Decl. ¶ 14; Exhibits 8 and 9] In short, Plaintiff cannot rely on this alleged unprofessional conduct by his peers to create a genuine issue of material fact as to whether he sustained a materially adverse retaliatory act by the Company. *See Evans*, 936 F.3d at 195.

Finally, Plaintiff's retaliation claim is further weakened by his admission that both he and Manning were subjected to similar treatment by Cooper, Bailey, and Tarrant. For example, Plaintiff admitted Manning's office was moved, Manning was excluded from sales meetings, and Manning was not asked to go on calls. [Stanley 87:4-19, 106:10-107:9] Plaintiff's allegations that he was being retaliated against because he engaged in protected activity by supporting Williams and complaining about his own alleged "harassment" ring hollow in light of the fact that Manning was subjected to the same treatment. Further, Williams provided a non-retaliatory reason for the

office move when she testified Tarrant shared the reason for the move was to allow the sales team to have better access to Plaintiff and Manning. [Williams 64:1-9]

Given the foregoing, Plaintiff has not proffered sufficient evidence to carry his burden of showing a materially adverse action to support his retaliation claim—with the exception of his termination.

**B. Plaintiff cannot show a causal connection between any alleged protected activity and any alleged adverse employment action.**

Even if Plaintiff can show that he engaged in protected activity and sustained a materially adverse employment action, Plaintiff must still demonstrate a causal connection between the two in order to establish a prima facie case of retaliation. While temporal proximity can be used in some instances to show a causal link, temporal proximity alone will not suffice where the passage of time undermines any conclusion that the events are causally connected. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding that a twenty-month gap suggested "no causality at all"; citing cases finding no causal link when the gap was only three or four months). In that event, a plaintiff may establish causation by presenting circumstantial evidence of retaliatory intent during the longer intervening period between the protected conduct and the adverse action such as (1) antagonism or retaliatory animus during the intervening period or (2) inconsistent reasons for termination indicative of pretext. *See, e.g., Lettieri v. Equant Inc.*, 478 F.3d 640, 650-51 (4th Cir. 2007) (intervening events between protected conduct and termination showed continuing retaliatory animus).

As previously noted, "retaliation claims require proof that the desire to retaliate was *the* but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528-30 (emphasis added). "When causation is dispositive, a case should proceed to the jury only where circumstantial evidence supports a probability, both reasonable and substantial, of an

22

impermissible motive rather than its mere possibility so as to insure the jury will not rely on speculation or conjecture." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 2017 U.S. App. LEXIS 15521, at *19 (4th Cir. Aug. 17, 2017) (unpublished) (citation omitted).

Here, Plaintiff cannot demonstrate a causal connection between any of his alleged protected activity and the alleged retaliatory conduct. Admittedly, the time between Plaintiff's complaint about the Images and his subsequent termination are close in time. However, temporal proximity alone cannot satisfy the causal connection as to this theory of retaliation. First, Plaintiff did not complain about the Images until *after* he was requested to provide an explanation as to whether he knew how Williams' name might have appeared on the Lync conference bridge during the Call. [Arbaugh Decl. ¶ 17; Exhibit 10; Stanley 147:19-148:9; Arbaugh Decl. ¶ 23; Exhibit 15]. In other words, Suddenlink had already started investigating the circumstances surrounding the Call before he lodged any complaint about the Images. Plaintiff cannot now use his belated complaint about the Images to attempt to avoid the consequences for sharing confidential and proprietary Company information. *See Pulley v. KPMG Consulting, Inc.*, 348 F. Supp. 2d 388, 397 (D. Md. 2004) ("The sword of an EEOC complaint cannot be used as a shield to protect an employee from the consequences of inappropriate behavior that is incontrovertibly below the reasonable expectations of his employer").

As Plaintiff was aware, Suddenlink's Employee Handbook explicitly prohibits employees from sharing confidential information. [Arbaugh Decl. ¶ 27; Exhibit 18]. Employees who violate this policy are subject to disciplinary action, including immediate termination. [*Id.*] Plaintiff admitted he was well aware of the need to keep Company information confidential and that failure to do so could result in termination of employment. [Stanley 40:12-23].

23

Further, the results of the investigation of the Call clearly disprove any causal connection between the complaint about the Images and Plaintiff's subsequent termination. As part of the investigation, Arbaugh pulled multiple Company records such as cell phone records, emails, and IM's. [Arbaugh Decl. ¶ 22; Exhibit 14] She also conducted in-person interviews of attendees on the Call. [*Id.*] The records overwhelmingly pointed to Plaintiff as the source of the leak. In fact, Arbaugh did not find any information which implicated any other attendee on the Call. [*Id.*] Plaintiff was the only individual that could be connected to Williams through cell phone records and emails. [*Id.*] The only logical conclusion based on the information obtained was that Plaintiff had either shared the call-in information with Williams or was with her during the Call. [*Id.*] Thus, Arbaugh recommended termination of Plaintiff's employment because of the risk of proprietary information being leaked to a competitor. [*Id.*] Plaintiff acknowledged the strength of the evidence against him when he told Arbaugh during his interview he "knew" how it looked, but he did not give Williams the information for the Call. [*Id.*]

Moreover, the Company's actions disprove any causal connection and bely any retaliatory motive. The undisputed evidence in this case shows Suddenlink took its legal obligations seriously. For example, when Plaintiff lodged his Complaint about the Images, the Company immediately began investigating even though Plaintiff did not immediately report the conduct and even though the investigation into the Call had already begun. The Company could have assumed that Plaintiff's complaint about the Images was a subterfuge to deflect attention from Plaintiff and insulate him from discipline for leaking Company information. Instead, Suddenlink investigated the allegations and disciplined Penny after he admitted the conduct.

In sum, Plaintiff's suggestion that his complaint about the Images led to his termination simply is not supported by the facts or Plaintiff's own allegations. According to Plaintiff's theory

24

of the case, he had engaged in protected activity multiple times, and his employment was not separated until September 28, 2017. [Stanley 30:10-31:16] If the Company had wanted to retaliate against those who opposed actions that allegedly violated Title VII, why was he not terminated earlier? The only thing that changed was a lengthy and thorough investigation which pointed to Plaintiff as the only source of the leak of confidential Company information. Given the foregoing, Plaintiff cannot establish a causal connection between his complaint about the Images and his termination to establish a *prima facie* case of retaliation.

Plaintiff's attempts to show a causal connection between his earlier protected activity (i.e., participation in the investigation of Williams' complaint and his complaints about his own treatment) and the other alleged retaliatory actions (such as being excluded from meetings, moving his office, etc.) fares no better. As explained *infra*, none of the prior conduct constituted protected activity and none of the alleged retaliatory actions were materially adverse employment actions. Even if Plaintiff had made these showings, he has not proffered any evidence suggesting a causal connection between the two which shows Suddenlink had a retaliatory motive. At most, Plaintiff has shown disagreements with co-workers which constitute unactionable petty slights and minor annoyances. *Thorn*, 766 F.Supp.2d at 603. Plaintiff has not proffered any evidence showing Suddenlink took any sort of retaliatory action because of his alleged protected activity. Indeed, the facts show otherwise: his pay was not reduced, he was not disciplined, and he was not terminated until he was suspected of leaking confidential Company information. [Arbaugh Decl. ¶ 15] Accordingly, Plaintiff cannot show a causal connection between any protected activity and any alleged adverse employment action.

25

**D.** **The company had a legitimate, non-retaliatory reason for Plaintiff's termination.**

Even if Plaintiff could proffer evidence to establish a *prima facie* case, which he cannot, his claim must still fail because Suddenlink has articulated a legitimate non-retaliatory reason for its actions.

Here, Plaintiff's employment was terminated because Suddenlink reasonably suspected—following a thorough investigation—that Plaintiff shared confidential and proprietary information with a former employee who was now working for a competitor. Admittedly, Plaintiff denies he engaged in the conduct which led to his termination, and he disagrees with the decision to terminate his employment. [Stanley 31:4-7] Specifically, Plaintiff disputes that he shared any confidential, proprietary information with Williams or that he had anything to do with her name showing up on the conference bridge.

However, Plaintiff's disagreement with the decision to terminate his employment is insufficient to dispute Suddenlink's legitimate, non-retaliatory reason for terminating his employment. Whether Suddenlink made the right decision or whether this conduct warranted Plaintiff's termination is not a matter for the Court, which does not "sit 'as a kind of super-personnel department weighing the prudence of employment decisions.'" *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). "[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (first alteration in original) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)). Here, Suddenlink terminated Plaintiff because the overwhelming evidence suggested Plaintiff shared confidential Company information with a

26

former employee who was now working for a competitor. Plaintiff has not proffered any evidence—other than his own disagreement with this decision—to show that this reason was not the reason for his termination.

Further, Plaintiff's disagreement with the decision does not change the fact that Suddenlink believed Plaintiff's conduct warranted termination. The Fourth Circuit has repeatedly recognized that "'[i]t is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff.'" *Hawkins*, 203 F.3d at 280. Here, Suddenlink had to choose between Plaintiff's denials and the overwhelming evidence suggesting he shared the information with Williams. "If [plaintiff] was fired for misconduct [ ]he did not actually engage in, that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made." *Villa*, 858 F.3d at 903. Here, no reasonable juror could believe that Suddenlink was motivated by retaliatory animus in terminating Plaintiff based on the facts Arbaugh uncovered during her investigation which implicated Plaintiff.

### E. Plaintiff cannot show pretext.

Finally, Plaintiff's retaliation claim must fail because he cannot show pretext. Plaintiff may prove pretext by showing that the alleged nondiscriminatory "explanation [for termination] is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)). At the pretext stage, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct," which is effectively a "but-for" standard. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d at 252. In order to rebut these legitimate reasons, Plaintiff must establish first that these legitimate reasons are not truthful, and second, that the real reason for

27

the adverse action was Plaintiff's engagement in the protected activity. *See Holland*, 487 F.3d at 218 (citing *Beall*, 130 F.3d at 619). Plaintiff cannot make these showings.

First, Plaintiff has not presented any evidence which casts doubt on the fact that Suddenlink reasonably believed Plaintiff shared confidential, proprietary information with a former employee who was now working for a competitor. At most, Plaintiff can state that he did not engage in the conduct alleged and that Suddenlink is mistaken in its belief that he did. These "facts," even if true are insufficient to carry this burden. The record unequivocally shows Suddenlink "honestly believed" Plaintiff deserved to be discharged for violating Company policy in sharing information with a competitor. As such, pretext is absent, even if Suddenlink is wrong or mistaken about the underlying facts. *Holland.*, 487 F.3d at 217-18.

Second, Plaintiff may attempt to demonstrate pretext by questioning the quality of Suddenlink's investigation into the events that ultimately led to his termination. This attempt, however, must fail. The fact that the investigation may not have been as thorough as Plaintiff would have liked or reached a result Plaintiff disagrees with cannot establish pretext. *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

Moreover, Plaintiff has not presented any evidence—other than his own speculation and belief—that Suddenlink's real reason to terminate his employment was retaliation. Plaintiff has not provided sufficient evidence to support a plausible inference that Suddenlink's decision to terminate his employment was based solely on Plaintiff's engagement in protected activity as opposed to protecting Suddenlink's confidential and proprietary information.

Finally, Plaintiff cannot rely solely on temporal proximity to show pretext. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993). Plaintiff has not proffered any facts which would permit a jury to infer that Suddenlink's reasons for terminating Plaintiff's employment were mere pretext

28

for retaliation. Indeed, the overwhelming undisputed evidence proves Suddenlink had a non-retaliatory motive in terminating Plaintiff's employment, namely protecting confidential Company information. Accordingly, Suddenlink is entitled to Summary Judgment.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, Defendant respectfully requests that Plaintiff's Title VII retaliation claim (Count III of his Complaint) be DISMISSED WITH PREJUDICE.

Respectfully submitted this the 30th day of November 2020.

JACKSON LEWIS P.C.


BY:     */s/ Ann H. Smith*
        ANN H. SMITH
        N.C. State Bar No. 23090
        *Attorney for Defendant*
        3737 Glenwood Avenue, Suite 450
        Raleigh, NC 27612
        Telephone: (919) 760-6460
        Facsimile:   (919) 760-6461
        Email: ann.smith@jacksonlewis.com

29

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO.: 4:19-cv-00030-BO

| | | |
|---|---|---|
| STAN C. STANLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| UNIVERSAL CABLE HOLDINGS, INC. | ) | |
| d/b/a SUDDENLINK COMMUNICATIONS, | ) | |
| | ) | |
| Defendant. | ) | |

The undersigned certifies that on November 30, 2020, the foregoing *Memorandum of Law in Support of Defendant's Motion for Summary Judgment* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system which will send notification of such filing as follows:

Ciara L. Rogers
The Law Offices of Oliver & Cheek, PLLC
Post Office Box 1548
New Bern, North Carolina 28563-1548
ciara@olivercheek.com
*Attorney for Plaintiff*

JACKSON LEWIS P.C.

BY: */s/ Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
*Attorney for Defendant*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: ann.smith@jacksonlewis.com

4828-7366-3955, v. 1

30