IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO.: 4:19-cv-00030-BO

| | |
|---|---|
| STAN C. STANLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **DEFENDANT'S STATEMENT** |
| | ) **OF UNDISPUTED FACTS** |
| UNIVERSAL CABLE HOLDINGS, | ) |
| INC. d/b/a SUDDENLINK | ) |
| COMMUNICATIONS, | ) |
| | ) |
| Defendant. | ) |

1. Universal Cable Holdings, Inc. d/b/a Suddenlink Communications is a corporation organized and existing under the laws of the state of Delaware. It is authorized do business in North Carolina and does conduct business activities in North Carolina. [DE # 12, p. 2]

2. Suddenlink is a subsidiary of Altice USA which specializes in cable television, high-speed internet, broadband phone, home security, and advertising for residential and commercial customers. [Arbaugh Decl. ¶ 4]

3. Suddenlink has several facilities in North Carolina, including a location in Greenville, North Carolina, where Plaintiff worked. [Stanley 43:4-10]

4. Plaintiff began working with a predecessor of Suddenlink on July 9, 2001. [Arbaugh Decl. ¶ 5]

5. In February 2008, Plaintiff became a sales engineer—a position he held until his termination. [Arbaugh Decl. ¶ 6; Exhibit 1]

6. As a Sales Engineer, Plaintiff performed a variety of duties, including accompanying Account Executives on sales visits; assisting Account Executives with developing proposals; and acting as liaison between engineering and sales in determining costs and profitability of proposed projects. [Arbaugh Decl. ¶ 6; Exhibit 2]

7. Plaintiff reported to Sam Smith who was located in Texas, and Smith reported to Jose Lugo in New York. [Arbaugh Decl. ¶ 7]

8. In February 2015, Suddenlink hired Tracy Fryer Williams ("Williams") as an Account Executive in Greenville, North Carolina. [Arbaugh Decl. ¶ 8] At the time of her hire, she was supervised by Michael Tarrant ("Tarrant"). [Arbaugh Decl. ¶ 9]

9. Other Account Executives in Greenville whom Tarrant supervised included Sherry Cooper ("Cooper"),[1] Casey Bailey ("Bailey"), and Aaron Penny ("Penny"). [Arbaugh Decl. ¶ 10]

10. The Account Executives relied on Plaintiff and Chris Manning ("Manning"), Project Development Manager, for sales support. [Autry Decl. ¶ 6]

11. While employed with Suddenlink, Williams made multiple complaints with Human Resources regarding her treatment in the Greenville office. Specifically, Williams complained that her co-workers and supervisor did not like her and that she was "bullied" and "harassed" by them. [See, e.g., Arbaugh Decl. ¶ 11; Exhibits 3-6] She also complained that accounts were stolen from her and sales leads were unfairly distributed. [Id.]

12. Plaintiff encouraged Williams to report comments Tarrant made to Williams about "personal things" such as whether she was dating anyone and on one occasion, whether she had ever dated a married man; Plaintiff admitted he did not report this conduct to Human Resources. [Stanley 95:6-96:12]

---

[1] Sherry Cooper is sometimes referred to as Sherry Turner.

13. Plaintiff testified he complained in May 2015 to Tarrant that Cooper and Bailey were "harassing" Williams. [Stanley 72:24-73:10]

14. Plaintiff testified he reported that Cooper and Bailey were making "ugly" comments about Williams being a "stupid fucking bitch" who did not know how to sell. [Stanley 75:16-76:2]

15. After this initial complaint, Plaintiff continued to report to Tarrant issues involving Cooper and Bailey's treatment of Williams, including them trying to take work from Williams in Salesforce, a program used to manage sales and leads. [Stanley 79:3-9]

16. He also shared that Cooper and Bailey made a lot of "not very nice, not positive statements" about Williams that was just "really stupid stuff" and not sexual harassment. [Stanley 79:10-80:6; 81:9-13]

17. Despite Williams' multiple complaints, Human Resources personnel for the most part found her complaints to be unsubstantiated. For example, in the Investigative Report completed by Patty Brooke on January 2, 2017, she found "there seems to be unprofessional comments from [Williams, Cooper, and Bailey] that need to be addressed." [Arbaugh Decl. ¶ 11; Exhibit 6]

18. Brooke recommended that "leadership set professional expectations to the team and possibly look at the individuals on the team complete a civil treatment for employee's training." [Arbaugh Decl. ¶ 11, Exhibit 6]

19. As part of the investigation of Williams' complaints, Plaintiff was interviewed by Human Resources. [Stanley 24:9-25:17; 69:1-10]

20. Plaintiff testified that as a result of his "support" of Williams, he suffered alleged retaliation which included: others making unprofessional comments about him behind his back;

being excluded from sales meetings; keeping him from going on sales calls; and having his office moved. [Stanley 54:69:11-17; 85:6-89:18]

21. Plaintiff admitted he was not terminated after any of these interviews with Human Resources. [Stanley 31:12-19]

22. Plaintiff did not receive any sort of disciplinary action and his pay was not reduced following his participation in the investigations of Williams' complaints. [Arbuagh Decl. ¶ 15]

23. Both Plaintiff and Williams admitted that Manning was treated similarly to Plaintiff. For example, Manning's office was moved, he was excluded from sales meetings, and he was not asked to go on sales calls. [Stanley 87:4-19, 106:10-107:9; Williams 68:10-69:10, 99:6-25]

24. According to Williams, Tarrant moved Plaintiff and Manning's offices to allow the sales team to have better access to Plaintiff and Manning. [Williams 64:1-9]

25. Ultimately, Williams' employment was separated after she failed repeatedly to meet her sales quota month over month. [Arbuagh Decl. ¶ 12]

26. On April 5, 2017, Williams filed an EEOC Charge alleging retaliation "for complaining about unprofessional conduct and database irregularities." [Arbaugh Decl. ¶ 13; Exhibit7]

27. Eight days later, the EEOC dismissed this Charge of Discrimination with a no cause determination on April 13, 2017. [Williams Depo.; Exhibit 8, Plaintiff 000227]

28. The following month, Williams began working for CenturyLink, a direct competitor of Suddenlink, as a sales executive for new business in eastern North Carolina. [Williams Depo. 30:4-15]

29. After Williams' termination, Plaintiff admitted that the alleged retaliation abated somewhat although he contended he was still excluded from sales calls and required to submit new reports to his supervisor. [DE# 1, ¶ 38]

30. Plaintiff requested a call (the "Call") on Friday, August 25, 2017, to discuss a bid for Beaufort County Schools ("BCS"). [Stanley 27:2-13; 28:23-24]

31. BCS had published a request for proposals ("RFP) from service providers for an E-Rate project for the school system. [Autry 76:4-77:4]

32. This E-Rate proposal was one of the most complex and competitive opportunities Suddenlink would compete for on a yearly basis. [Autry 77:6-81:22]

33. The purpose of the Call was to discuss project costs so Plaintiff could calculate the initial rate of return ("IRR") for the project. [Stanley 28:7-20]

34. Dedric Staton, a Suddenlink employee, set up the call using Microsoft Lync ("Lync"), a software program Suddenlink used to organize and manage participation in conference calls. [Stanley 29:6-9; Autry 67:14-24]

35. The Lync program permits invitees to participate either by using a dial-in number and conference code, or by connecting through the Lync website via an online link. [Autry 64:13-23]

36. All attendees invited to the Call were Suddenlink employees. [Autry Decl ¶ 8]

37. At the beginning of the Call, the leader called the roll to confirm attendees. [Arbaugh Decl. ¶ 17; Exhibit 10]

38. When roll was taken, Penny noticed Plaintiff did not initially respond when his name was called. [Arbaugh Decl. ¶ 17; Exhibit 10]

39. Manning, another attendee on the Call, whose cubicle was near Penny's, separately called Plaintiff (who was not in the office at the time) to ensure his attendance on the Call. [Stanley 29:13-19] When Plaintiff answered his phone, he told Manning his phone was dying, but he would jump on the call. [*Id.*] Plaintiff then got into his vehicle, plugged in his phone, called into the Call, and drove to the office where he went to Manning's office to complete the call. [*Id.*]

40. While Manning was on speakerphone with Plaintiff asking Plaintiff to join the call, Cooper overheard the conversation. [Arbaugh Decl. ¶ 18; Exhibit 12] She walked over to Penny's desk where she looked at the computer which showed the individuals called into the call. [*Id.*] She saw Williams' name as being a participant on the Call. [*Id.*]

41. After the Call, both Cooper and Penny reported to their supervisor, John Autry, that they had observed Williams' name on the conference bridge. [Arbaugh Decl. ¶ 18; Exhibits 11 and 12].

42. Autry requested that both Cooper and Penny give him a written statement outlining what they had witnessed. [Arbaugh Decl. ¶ 19; Exhibit 13]

43. Once Autry received the statements, he reported the information to his supervisor, Michael Shaffer. [Autry 91:22-92:3]

44. Even though he had never dealt with a situation like this before, Autry felt obligated to report the incident because the purpose of the Call was to discuss confidential and proprietary trade secret information on how to respond to the Beaufort County Schools E-Rate RFP—a very competitive process. [Autry 94:12-97:1]

45. On Monday, August 28, Smith received an email from Steve Tulloh, Shaffer's supervisor, requesting that Smith obtain information from Plaintiff related to the August 25 Call. [Arbaugh Decl. ¶ 17; Exhibit 10]

46. After receiving the email, Smith contacted Plaintiff to speak with him regarding the Call. [*Id.*]

47. During this conversation, Plaintiff revealed for the very first time that Penny had sent him an "inappropriate" video (the "Images") to his work cell phone a week earlier on August 21. [*Id.*; Stanley 147:19-148:9; Arbaugh Decl. ¶ 23; Exhibit 15].

48. Smith questioned why Plaintiff had not reported this immediately as required by Company policies. [Arbaugh Decl. ¶ 17; Exhibit 10]

49. Plaintiff indicated he had just noticed the video and thought someone else would have reported it. [*Id.*]

50. Upon receipt of this complaint from Plaintiff, Smith reported this information to Lugo, his supervisor, who escalated the issue up to Human Resources. [Lugo 24:15-27:22]

51. In addition to reporting the Images to his supervisor, Plaintiff also reached out to Penny's supervisor, Autry, to report that Penny had shared inappropriate materials with him and that he was going to report this to HR. [Autry 162:2-20]

52. Eventually, Duska Arbaugh, Regional Director of Human Resources, was tasked with investigating: (1) the August 25 Call; and (2) Plaintiff's complaint about the Images. [Arbaugh 17:14-16; Arbaugh Decl. ¶¶ 16 and 23]

53. On August 30, 2017, Autry, Penny's direct supervisor, spoke with Penny concerning Plaintiff's allegation that Penny shared the Images with Plaintiff on August 21, 2017. [Autry 166:7-13; Arbaugh Decl. ¶ 24; Exhibit 16]

54. Penny indicated he had received a video from a friend (not a Suddenlink employee) titled "Eclipse." [*Id.*]

55. Penny admitted to showing the video to Manning and Plaintiff on the morning of August 21, 2017. [*Id.*]

56. Penny stated that he, Plaintiff, and Manning often willingly shared "Adult Humor" among themselves, and that Penny had been the recipient of similar material from Plaintiff in the past. [*Id.*]

57. When Penny showed the Eclipse video to Plaintiff, Plaintiff said the video was "hilarious" and asked Penny to send it to him so he could share it with his son. [*Id.*]

58. When Penny asked for Plaintiff's personal cell phone number, Plaintiff instructed Penny to send the Images to his work cell phone. [*Id.*]

59. Penny admitted sending the video to Plaintiff's work phone. [*Id.*]

60. Penny further acknowledged his behavior was inappropriate and committed to not participating or being involved in the type of behavior moving forward. [Arbaugh Decl. ¶¶ 24 and 25; Exhibits 16 and 17]

61. Autry sent Arbaugh an email summarizing his discussion with Penny. [Autry 162:2-13; Arbaugh Decl. ¶24; Exhibit 16]

62. As part of the investigation of this complaint, Arbaugh spoke with Plaintiff about his allegations. [Arbaugh 96:9-97:3]

63. Following the investigation, Penny received a corrective action for sharing inappropriate material in the workplace. [Arbaugh Decl. ¶ 25; Exhibit 17; Arbaugh 97:2-3]

64. Plaintiff did not receive any disciplinary action in connection with these events. [Arbaugh Decl. ¶¶ 15 and 26]

65. As part of the investigation of the Call, Arbuagh pulled company cell phone records for each attendee from August 4, 2017 through August 30, 2017. [Arbaugh Decl. ¶ 22; Exhibit 14]

66. Based on these records, only Plaintiff's call log could be tied to Williams' personal cell phone and land line. [*Id.*]

67. When Arbaugh analyzed these records, she found that Plaintiff and Williams had a total of 889 minutes of talk time with each other over a two-week period. [*Id.*]

68. In fact, Plaintiff and Williams talked on three separate occasions on the day of the Call. [*Id.*]

69. Despite this evidence, Arbaugh did not limit her investigation to cell phone records. [*Id.*]

70. She also requested email and Instant Message ("IM") searches, badge swipe information, and explored whether the Company could verify Plaintiff's location through GPS information. [*Id.*]

71. In addition, Arbaugh collected information pertaining to the numbers that dialed into the meeting and confirmed as part of her investigation that a call did come in from Williams' home land line. [Arbaugh 107:23-108:3; 119:7-21]

72. At her deposition, Williams admitted that she had a telephone landline at this time although she professed to be unable to remember the number. [Williams Depo. 12:8-15]

73. After gathering this documentation, Arbaugh conducted one-on-one interviews of attendees on the Call. [Arbuagh 109:23-12]

74. Of the individuals interviewed, Plaintiff was the only attendee who admitted to having an outside relationship with Williams. [Arbaugh Decl. ¶ 22; Exhibit 14]

75. When Arbaugh asked Plaintiff if he spoke to Williams on the day of the Call, he indicated he was not sure but "maybe." [*Id.*]

76. Arbaugh then shared Plaintiff's cell records reflected he spoke to Williams in the morning, in the afternoon before the Call, and later in the evening for a total of 74 minutes that day. [*Id.*]

77. When Arbaugh asked where he was during the Call, Plaintiff said he was parked in his driveway on his cell phone. [*Id.*]

78. During the interview, Plaintiff stated that he knew how "it looked," but he did not give Williams the number for the call. [*Id.*]

79. Based on this investigation, Arbaugh prepared a report which in which she concluded there was reasonable suspicion to believe that Plaintiff either provided the call-in number to Williams or that Plaintiff was with Williams during the Call. [*Id.*]

80. Suddenlink's Employee Handbook explicitly prohibits employees from sharing confidential information. [Arbaugh Decl. ¶ 27; Exhibit 18]. Employees who violate this policy are subject to disciplinary action, including immediate termination. [*Id.*]

81. The evidence of the investigation led her to believe Plaintiff's relationship with Williams posed a risk of Suddenlink's proprietary information being leaked or shared with a direct competitor. [Arbaugh Decl. ¶ 22; Exhibit 14]

82. Given this significant risk, Arbaugh recommended that Plaintiff be terminated. [*Id.*]

83. Suddenlink terminated Plaintiff's employment relationship on September 28, 2017. [Stanley 20:21-23]

84. Following his termination, Plaintiff filed a Charge of Discrimination on October 3, 2017, alleging discrimination on the basis of sex, age and retaliation. [DE # 1-1]

85. The EEOC issued a Dismissal and Notice of Rights on December 3, 2018, and Plaintiff filed this action on March 1, 2019. [DE # 1]

Respectfully submitted this the 30th day November 2020.

JACKSON LEWIS P.C.

BY:    */s/ Ann H. Smith*
        ANN H. SMITH
        N.C. State Bar No. 23090
        *Attorney for Defendant*
        3737 Glenwood Avenue, Suite 450
        Raleigh, NC 27612
        Telephone: (919) 760-6460
        Facsimile: (919) 760-6461
        Email: ann.smith@jacksonlewis.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO.: 4:19-cv-00030-BO

| | |
|---|---|
| STAN C. STANLEY, | ) |
|     Plaintiff, | ) ) ) |
| vs. | ) ) **CERTIFICATE OF SERVICE** |
| UNIVERSAL CABLE HOLDINGS, INC. d/b/a SUDDENLINK COMMUNICATIONS, | ) ) ) ) ) |
|     Defendant. | ) ) |

The undersigned certifies that on November 30, 2020, the foregoing *Defendant's Statement of Undisputed Facts* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system which will send notification of such filing as follows:

Ciara L. Rogers
The Law Offices of Oliver & Cheek, PLLC
Post Office Box 1548
New Bern, North Carolina 28563-1548
ciara@olivercheek.com
*Attorney for Plaintiff*

                          JACKSON LEWIS P.C.

BY:   /s/ *Ann H. Smith*
         ANN H. SMITH
         N.C. State Bar No. 23090
         *Attorney for Defendant*
         3737 Glenwood Avenue, Suite 450
         Raleigh, NC 27612
         Telephone:  (919) 760-6460
         Facsimile:  (919) 760-6461
         Email:  ann.smith@jacksonlewis.com

4833-0761-1846, v. 1