# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION
### FILE NO.: 4:19-cv-00030-BO

| | | |
|---|---|---|
| **STAN C. STANLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **RESPONSE IN OPPOSITION** |
| | ) | **TO DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AND BRIEF IN** |
| **UNIVERSAL CABLE** | ) | **SUPPORT BY PLAINTIFF STAN C. STANLEY** |
| **HOLDINGS, INC. d/b/a** | ) | |
| **Suddenlink Communications,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Plaintiff Stan C. Stanley, by and through undersigned counsel, respectfully submit this response in opposition to Defendant Universal Cable Holding, Inc.'s motion for summary judgment [Doc. No. 39] ("Motion") and memorandum of law in support of Defendant's motion for summary judgment [Doc. No. 40] ("Memorandum"). By this response, Plaintiff requests that the relief requested in the Motion be denied and summary judgment be granted in favor of Plaintiff. In support of this response, Plaintiff shows the court the following:

## NATURE OF THE CASE

Plaintiff initiated this action by filing a complaint on March 1, 2019, which asserted three Title VII claims: disparate treatment based on gender, hostile work environment, and retaliation [Doc. No. 1]. On April 20, 2020, Defendant filed a Partial Motion to Dismiss [Doc. No. 10], which sought dismissal of the claims for disparate treatment based on gender and hostile work environment. By order dated July 3, 2019 [Doc. No. 19], those were dismissed; however, Plaintiff's retaliation claim survived and is the subject of the Motion.

## STATEMENT OF FACTS

**A.     Plaintiff's Employment with Defendant and its Predecessors**

1.     Plaintiff began working for Cox Communications, a predecessor of Defendant, in July of 2000 as an information technology support specialist. [Stanley 14:5-12; 33:15; Stanley Aff. ¶2]

2.     Between 2001 and 2008, Plaintiff suffered physical and emotional abuse by his direct supervisor.  [Stanley Aff. ¶ 3, Stanley 33:16-24] Out of fear he'd lose his job, Plaintiff did not report the abuse.  [Stanley 33:5-17, 44:18-20]  His then co-workers reported the abuse to HR on his behalf.  [Stanley 33:5-12]

3.     After the report was made, Stephen Bryan, head of the department where Plaintiff was working, told Plaintiff that had Plaintiff made the complaint that his supervisor was physically and emotionally abusing him at work he would have not been believed and would have been terminated. [Stanley 41:18 – 42:3; Stanley Aff. ¶ 4]

4.     In February 2008, Plaintiff was promoted to the position of sales engineer by Defendant in 2008.  [Stanley 33:16-25] Between February 2008 and September 2017, Plaintiff was the only sales engineer in Defendant's Greenville Office.  [Stanley 43:3-5]  As a sales engineer, Plaintiff performed a variety of duties, including but not limited to, accompanying account executives on sales calls, performing site surveys, making product recommendations, developing network solutions, working  with order entry specialists to ensure that orders were completed accurately and efficiently, assisting internet protocol engineers with installations. [Stanley 35:6 – 36:16; Stanley Aff. ¶ 6; Lugo Dep. Ex. 15]

5.     In the first quarter of 2015, Defendant advertised and interviewed candidates for an account executive position with the sales team based in Greenville, North Carolina

(Greenville") Plaintiff and Christopher Manning, who was then a project development manager, were tasked with conducing peer interviews of the candidates. There were two candidates vying for the position, one was an internal candidate and the other was Tracy Fryer-Williams ("Williams"). Plaintiff and Manning recommended Williams be hired based on her experience and interview. [Stanley 13:10-21, 16:19-20; Manning Aff. ¶ 12; Stanley Aff. ¶ 9] Prior to the peer interviews Plaintiff did not know Williams. [Stanley 12:11-13; Stanley Aff. ¶ 9]

6.     Defendant hired Williams as an account executive on the Greenville commercial sales team in February 2015. [Arbaugh Decl. ¶ 8] When Williams was hired, the commercial sales team based in Greenville included Aaron Penny, Sherry Cooper, and Casey Bailey. The sales team was supervised by Tarrant. [Complaint ¶ 16]

7.     After Williams was hired, members of the sales team resented Williams for being hired as the account executive instead of the internal candidate. [Manning Aff. ¶ 13; Stanley Aff. ¶ 10] Cooper or Bailey went so far as finding a mugshot of Williams and posting it in the office. [Manning Aff. ¶ 14; Stanley Aff. ¶ 10] Plaintiff took the mugshot down. [Stanley Aff. ¶ 10; Manning Aff. ¶ 14]

8.     Shortly after Williams was hired, Tarrant required Plaintiff to devote at least 70% of his time to assisting Williams with her sales because other account executives refused to train or work with her. [Stanley 52:2-7; Williams 197: 13-15; Manning Aff. ¶ 15; Stanley Aff. ¶12]

9.     In 2015, Plaintiff began reporting directly to Sam Smith ("Smith"), Director of Sales Engineering. [Stanley 42:12-17] Smith was based in Tyler, Texas. [Stanley 42:16-16; Manning Aff. ¶ 7]

10.     Williams began experiencing what she believed to be sexual harassment shortly after being hired. [Williams 73: 13; Williams Aff. ¶ 4] That harassment included Tarrant

repeatedly asking her about her personal life including whether she was dating anyone, whether she ever dated co-workers, and whether she ever dated married men. [Williams 73:8-74:16] Tarrant's comments made Williams feel shocked and awkward because he was married, worked with her, and was her supervisor. [Williams 73:24 – 74:2 and 74:15; Arbaugh Decl. ¶ 9]

11.    Eric Harris, Vice-President of Sales, also made sexually inappropriate comments about Williams when talking to Manning. On one occasion, Harris told Manning he wanted to "bend Williams over a car." Manning understood that to mean Harris wanted to have sexual relations with Williams. [Manning Aff. ¶ 17]

12.    Williams also reported being harassed and bullied by other account executives in the Greenville office including Cooper, Casey Bailey, and Penny. [Williams Aff. ¶ 6, 8, 9, 11, 12] That harassment and bullying included having accounts that she had generated or that were assigned to her taken by other account executives [Manning Aff. ¶ 17; 21;Suddenlink_000894], being cursed at [Williams 77:20-21, 192: 11, 196:23-24, 197:5], and not receiving adequate training or support. Williams reported these issues to management HR, and the anonymous hotline for reporting issues. [Williams 126:18 – 127:12; 193: 2-3; 240:10-12]

13.    In January or February 2016, William Scott McKittrick ("McKittrick"), a HR representatives based out of West Virginia visited the Greenville office to interview Williams, Plaintiff, Manning, and the members of the sales team regarding Williams' complaints of sexual harassment, bullying, and stealing accounts. After McKittrick left Greenville, Plaintiff, and Manning began to be treated differently than they had been by members of the sales team. [Williams 199:16-21; Stanley 24:15-18; Manning Aff. ¶ 18] It was obvious that McKittrick had shared what he was told by Plaintiff and Manning because their statements were repeated back to them by members of the sales team. [Stanley Aff. ¶ 20]

14.    On multiple occasions beginning in 2016, Plaintiff was interviewed by management and HR representatives including Patricia Brook, McKittrick, Peggy Wooten, and Andrea Nelson, about Williams' complaints of harassment and violations of Suddenlink's polices. [Stanley 24:9-13; Stanley Aff. ¶ 19; Williams Aff. ¶¶ 12-13] Each time he was interviewed, Plaintiff reported what he personally observed regarding how Williams was being treated. [Williams 194:21 - 195:4; Stanley 24:9-25:17; 69:1-10]  During the various interviews, Plaintiff also reported that he believed Williams was the victim of sexual harassment, bullying, and retaliation.  [Stanley Aff. ¶ 19] After each interview, Plaintiff noticed Penny, Cooper, Bailey, and Tarrant would increase their efforts to make the work environment unbearable.  [Stanley Aff. ¶¶ 20-22; Complaint, ¶¶ 21 – 25]  After Plaintiff participated in the investigations: (i) Cooper, Bailey, and Penny started rumors about him and Williams' relationship; (ii)  Tarrant began accusing Plaintiff of being lazy and not willing to work with others when in actuality he had ordered Plaintiff to devote most of his time to working with Williams; (iii) Cooper, Bailey, and Penny stopped including him in preparing bids and going on sales calls when his calendar was open; (iv) Tarrant moved his office to a space closer Cooper, Bailey, and Penny, whom he had complained were retaliating against him; (vi) Cooper falsely accused Plaintiff of physically attacking her and knowing he had not attached her complained to HR that he had; (vii) Cooper regularly called Plaintiff a "stupid fucker" when she walked by him or his office and would laugh and whisper in other people's ear whenever they crossed paths in the office.  [Stanley 69:11-17; 85:6-89:18, 120:23; Williams 62: 10-12; 105:5-8; 114: 21 – 115:81;127:13-23; 271:1-14]  Cooper even told Plaintiff that "HR was gonna handle him: and "take care of him." [Williams, 255:2-22].  Plaintiff understood that to be a threat that he was going to be fired. [Stanley Aff. ¶ 23]

15.     Prior to participating in the investigations into Williams' complaints, Plaintiff was well-liked in the office and worked well with everyone. [Manning Aff. ¶ 20; Stanley Aff. ¶ 8] and he had never been the subject of any complaints. [Arbaugh 98:20-99:7].

16.     As a result of Williams' complaints about accounts being stolen and the investigation into those complaints, Tarrant's employment with Defendant was terminated in August 2016. [Arbaugh 79:8-80:9] Cooper and Bailey blamed Williams for Tarrant being fired. [Manning Aff. ¶ 18]

17.     Autry replaced Tarrant as the supervisor of the Greenville sales team. [Autry 24:8-16; Manning Aff. ¶ 22]

18.     Williams' employment with Defendant was terminated February 7, 2017. [Williams 35:10-18]

19.     Based on her employment relationship with Defendant, Williams filed two charges of discrimination with the Equal Employment Opportunity Commission's Raleigh Area Office. [Williams 46:11-13; 211:7-23] The first charge of discrimination was filed on April 5, 2017 and alleged Williams was retaliated against for complaining of conduct in violation of Title VII. [Williams 212:2-11; 80:13-14; Williams Aff. ¶ 29] Williams named Plaintiff as a witness when speaking to investigators and other EEO representatives and Plaintiff met with EEOC investigators on Williams' behalf. [Williams 80:17-19; Stanley 18:11-13; Williams Aff. ¶ 20; Stanley Aff. ¶ 29]

20.     Following Williams' termination, Plaintiff continued to be excluded from sales calls and assignments he had previously been heavily involved in, had his office moved a second time to a less desirable location, and was required to start submitting reports detailing his work that no other sales engineer had to submit. [Complaint, ¶38; Stanley 69:15-17; Stanley Aff. ¶ 31]

21.     Williams was hired by CenturyLink as an account executive focusing on private commercial businesses accounts after leaving Suddenlink. [Williams 30:4-5; Williams Aff. ¶ 30] Plaintiff, Manning, and others stayed in contact with Williams after her employment with Defendant was terminated.  [Stanley 29:6-9; 170:6-23].

22.     After, Williams' employment with Defendant was terminated, Defendant's representatives were unable to close on a project.  Smith asked Plaintiff to contact Williams at CenturyLink for assistance in finalizing the customer's project for the benefit of Defendant. [Stanley 168:15-25; Williams 188:3-18; 209:8-19]   Plaintiff did as he was asked, Williams provided the needed assistance, and the project was completed, which benefitted Defendant. [Stanley Aff. ¶ 32; Williams Aff. ¶ 32]

23.     Plaintiff was involved in preparing the bid for a project with Beaufort County Public Schools.  [Stanley Aff. ¶ 34]   In assisting with the preparation of the bid, Plaintiff requested that the construction and sales teams hold a conference call to discuss costs related to running fiber.  [Stanley 27:14 – 28:13; Stanley Aff. ¶ 34-35; Manning Aff. ¶ 27]

24.     Dedric Staton, a project development manager, scheduled the call for August 25, 2017 at 1:00pm (the "Call") and circulated the meeting invitation via email.  The meeting invitation included the information invitees needed to dial in to the call.  [Stanley 27:2-13; 28:22 – 29:10; Autry 70:1-3; Stanley Aff. ¶ 35] Plaintiff did not need to participate in the call and did not plan on doing so.  [Stanley Aff. ¶ 36]

25.     On August 21, 2017, Plaintiff and Penny engaged in a heated exchange after Penny sent text messages of male genitalia to Plaintiff's work issued cell phone in violation of Defendant's policies.  [Stanley 153: 2-19; Stanley Aff. ¶ 33; Manning Aff. ¶ 26] Manning was present during this exchange and heard Plaintiff tell Penny not to send any messages that were

inappropriate for work to his work cell phone.  Despite Plaintiff's request, Penny sent a second inappropriate text message to Plaintiff's work cell phone.  Plaintiff did not realize the second inappropriate text message had been sent until days later.  [Stanley 150: 20-24; Stanley 154:3-11; Stanley Aff. ¶¶ 33, 39]

26.    On August 21, 2017, Plaintiff reported to Autry that Penny sent the inappropriate text message, but he did nothing.  [Stanley 148:17-20]

**B.    The Call and Investigation into the Call**

27.    At the designated time for the Call, Plaintiff was at home having lunch with his children. [Stanley Aff. ¶36].

28.    Shortly after the Call was scheduled to start, Manning called Plaintiff and told him that they were waiting for him to join the Call. [Stanley 29:10-22; Stanley Aff. ¶ 37; Manning Aff. ¶ 29]   Plaintiff dialed into the Call from his work cell phone.  Plaintiff's cellphone ran out of power, so he went to his vehicle, began charging the cell phone and driving back to the office.  [Stanley 136: 6-23]  While on his way back to the office, Plaintiff's phone powered back on and he was able to dial back in to the Call.  [Id.]  Once Plaintiff arrived at the office, he went to Manning's office and participated in the Call from there.  [Stanley 136: 15-23]

29.    During the Call, Penny alleged he saw Williams' name appear in the list of participants.  [Arbaugh Decl. ¶ 16]  When providing a statement after the Call, Penny said nothing was discussed while Williams' allegedly appeared on the participant list. [SUDDENLINK_000425-426, 429]

30.    After the Call, Penny and Cooper, who was not on the call, went to Autry's office and reported that Williams' name appeared on the participant list and accused Plaintiff of giving proprietary and confidential information to Williams.  [Autry  88:7-25]  Autry asked Penny and

Cooper to submit written statements of their reports, which they did. [Autry 91:6-21

31.     Plaintiff did not give Williams information related to the Call or any proprietary or confidential information belonging to Defendant at any time before or after the Call. [Stanley 31: 4-7; 146:9-147:6; Williams Aff. ¶ 36]

32.     Williams did not dial into the Call and could not benefit from information about Defendant's e-rate bid for Beaufort County Public Schools. [Williams 274:22-275:10; Williams Aff. ¶ 35]

33.     After receiving Penny and Cooper's written statements, Autry reported to his supervisor, Michael Shaffer, that proprietary information was discussed on the Call and there was a high probability that Plaintiff had given proprietary information to Williams. [Autry 88:7-17; 90:14-17; 95:3-5; Autry Ex. 8] Autry did not discuss the Call or the allegations made by Penny and Cooper with Plaintiff prior to reporting to Schaffer. [Stanley Aff. ¶ 40]

34.     Also on August 25, 2017, Plaintiff reported to Smith that on August 21, 2017 Penny sent unwanted sexually explicit text messages to his work cell phone. [Stanley 148:5-11] Plaintiff made the report that day because he had not realized Penny sent a second inappropriate text message after Plaintiff asked him not to do so. [Stanley Aff. ¶ 33, 39] On August 28, 2017, after not hearing back from Smith about his complaint against Penny, Plaintiff sent an instant message to Smith asking him to take some action. Still having heard nothing substantive, Plaintiff emailed Smith on August 29, 2017 and again asked that something be done. [Stanley Aff. ¶ 39]

35.     On or about September 8, 2017, Autry's allegation reached Duska Arbaugh, Regional Director of HR. At that time, Arbaugh was responsible for overseeing personnel issues in the Greenville office. [Arbaugh 85:4-20]

36.     On August 30, 2017, Autry, spoke with Penny about the lewd images he sent via text message to Plaintiff's work cell phone on August 21, 2017.  Penny admitted he had sent sexually explicit text messages to Plaintiff's work cell phone and that the messages violated Defendant's policies. [Autry 166:7-13; Arbaugh Decl. ¶ 24]  No investigation was performed and Penny was given a mere written warning as discipline. [Arbaugh Decl. ¶ 25; Arbaugh 97:2-3; Autry Ex. 10]

37.     Despite not being responsible for investigating personnel issues, Autry and Penny purported to "investigate" their claim that Plaintiff provided Williams with proprietary information.  Their sham investigation involved them attempting to recreate the participant list with Williams' name on, testing whether the telephone number assigned to Ms. Williams while she was employed by Defendant was still registered to her in the company directory, and performed a reverse look-up using whitepages.com to identify the owner of the telephone number.  [Autry 157:14-24]

38.     According to Autry, Penny created a screen shot of the participant list from the Call.  However, the screen shot produced does not show Williams' name, as Penny and Cooper reported, but showed a telephone number Penny alleged belonged to Williams.  The telephone number Penny said belonged to Williams was (252)689-2404.  [Autry Ex. 9; Autry 147: 6-18]

39.      Autry alleges that when he and Penny searched that telephone number on whitepages.com, the search results said the telephone number was owned or associated with "Williams T Fryer" [Autry 190:14 – 196:23]. During his deposition taken in this case, Autry said that searching the telephone number at that time would prove the accuracy of his search. However, when (252)689-2404 was searched for using whitepages.com during Autry's deposition, the search results did not indicate the telephone number was owned by Williams T.

Fryer. In fact, the search results said no information regarding the number was available including any prior addresses or persons associated therewith, but the results did identify the telephone number as one serviced by Suddenlink. [Autry 190:14 – 196:23; Autry Ex. 12-14]

40. Arbuagh requested the cell phone records for the company issued cellphones of each person who participated in the Call. Her initial request was for all records available from August 4, 2017 through August 30, 2017. [Arbaugh Decl. ¶¶ 20, 22]

41. Arbaugh made a second request for records related only to Plaintiff's company issued cellphone, which were provided to her on September 21, 2017. [Arbaugh Ex. 21] Records related to Plaintiff's company issued cellphone were not available prior to June 27. [Arbaugh 141:15 – 142:6].

42. Arbaugh alleges she interviewed everyone who participated in the Call. [Arbaugh 109:20 – 110:12] Of the nine people interviewed, six people said they did not recall Williams' name appearing on the participant list or Penny saying anything about her name appearing in the participant list during the Call. [Arbaugh Ex. 24, 27;]. One person, Andrew Pushak, indicated that anyone could have the conference call dial-in instructions because Staton uses the same instructions for every call he set up. [Arbaugh 123:5-18; Manning Aff. ¶ 28]

43. Arbaugh blindly accepted and relied on information provided by Autry and Penny when conducting her "investigation" despite knowing that Plaintiff had supported Williams' complaints against Penny, that Penny and Plaintiff had recently had a disagreement in the office just four days before the Call, and that Cooper, who allegedly also saw Williams' name on the participant list had threatened Plaintiff that HR would "handle" him. [Arbaugh 119:11-21; 115:18-116:1]] If Arbaugh had actually conducted an investigation, she would have noticed that the telephone number (252-689-2404) from Penny's screenshot and whitepages.com search does

not appear in Plaintiff's call log during the two weeks before the Call.

44.     Arbaugh made up her mind that Plaintiff had done what Penny and Cooper alleged before completing her investigation.  [Arbaugh Ex. 25]  Having made up her mind that Plaintiff had given Williams confidential and/or proprietary information, Arbaugh conducted her investigation in a way that could only result in her predetermined conclusion. [Arbaugh 146:9-13]

45.     Ultimately, Arbaugh concluded that because Plaintiff and Williams spoke regularly during the two weeks before the Call and Plaintiff was the only employee who admitted to maintaining a friendship with Williams after her termination that Plaintiff must have shared Defendant's proprietary information with Williams [Arbaugh Decl. ¶ 22]

46.     On September 28, 2017, Plaintiff was called into a meeting with Wooten, Smith and Arbaugh.  During that meeting, Arbaugh told Plaintiff that his employment with Defendant was being terminated. [Stanley 188:1-11] Arbaugh refused to tell Plaintiff why his employment was being terminated. [Id.]

47.     Between August 25, 2017, when the allegation that Plaintiff had given Williams proprietary and/or confidential information belonging to Defendant and September 28, 2017 when Plaintiff's employment was terminated, Plaintiff continued to have full access to Defendant's proprietary and confidential information and participate in preparing the e-rate bid for the Beaufort County Schools project. [Arbaugh 187:2-7]

**<u>STANDARD OF REVIEW</u>**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986). Material facts are identified by substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A genuine issue exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id., at 249.

The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate the presence of a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must view "the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party. . . . In doing so, [it] must not weigh evidence or make credibility determinations." *Foster*, 787 F.3d at 248 (internal citations and quotation marks omitted). See also *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (noting summary judgment is only appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact"). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the [trier of fact] is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

## ARGUMENT

Title VII bans retaliation or discrimination against any person "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "To establish a prima facie retaliation claim . . . a plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012); see also *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015). The plaintiff is not required to know to a certainty that the opposed practice is unlawful. Instead, his opposition to any employer action that he reasonably believed to be a substantive Title VII violation is protected conduct. *Navy Fed.*, 424 F.3d at 406; see also *Reynolds*, 701 F.3d at 154. The bar for what constitutes opposition is not high; and, any comment that disapproves of allegedly discriminatory workplace conduct is considered opposition to an unlawful employment practice. See *Crawford v. Metro. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015).

Once Plaintiff has met his burden of showing he engaged in protected activity, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250. Then, if the employer meets its burden, the burden again shifts back to the Plaintiff to show that the "purported non-retaliatory reasons were not its true reasons, but were a pretext . . . ." *Id.* A plaintiff's prima facie burden is not meant to be onerous. *Texas Dept. of Commun. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). He need only proffer "*evidence adequate to create an inference that an*

*employment decision was based on an illegal discriminatory criterion.*" *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (emphasis in original; internal citation omitted).

## I.     PLAINTIFF WAS RETALIATED AGAINST IN VIOLATION OF TITLE VII

Plaintiff can and will show that he was retaliated against after he engaged in protected activity.   Defendant does not dispute that Plaintiff suffered the ultimate adverse action – termination. Memorandum, p. 19. Defendant terminated Plaintiff's employment after seventeen years after doing nothing to protect Plaintiff from blatant retaliation that violated Title VII and Defendant's own anti-harassment policy.   Further, the evidence will show that Defendant's alleged justification for Plaintiff's termination was pretextual because Plaintiff did not share proprietary or confidential information belonging to Defendant with any unauthorized person and Defendant's alleged belief that he did was the result of a sham investigation.

### A.     Plaintiff Engaged in Protected Activity

 "[A]n employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Any comment that disapproves of allegedly discriminatory workplace conduct is considered opposition to an unlawful employment practice. See *Crawford v. Metro. Gov't of Nashville and Davidson Cty.*, 555 U.S. 271, 276 (2009).

Title VII prohibits retaliation against employees because they either oppose discriminatory action or because of their participation in any manner in an investigation, proceeding, or hearing under Title VII.   It is clearly established that "in the context of a

retaliation claim, a protected activity may fall into two categories, opposition and participation. ... protected oppositional activities may include . . . complain[ts] . . . about suspected violations." *Navy Fed.,* 424 F.3d at 406 (citing *Laughlin v. Metro. Wash. Airports Auth.,,* 149 F.3d 253, 259 (4th Cir. 1998)); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 543–44 (4th Cir.2003)). "Section 704(a) protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *Navy Fed.*, 424 F.3d at 406. In the case at bar, both the Opposition Clause and Participation Clause are at issue.

### 1. Plaintiff Engaged in Legally Protected Activity When He Opposed Conduct He Believed Was Sexual Harassment and a Hostile Work Environment as to Williams

"[P]rotected conduct includes not only the filing of administrative complaints … but also complaining to one's supervisors." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006). It is well established that "employees will often face retaliation not for opposing discrimination they themselves face, but for reporting discrimination suffered by others." *Crawford*, 555 U.S. at 279 n.3. "When an employee communicates to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication *virtually always* constitutes the employee's opposition to the activity." *Crawford*, 555 U.S. 271, 276 (2009). Employees engage in opposition by merely assisting another in filing and pursuing an internal sexual harassment complaint, even though he did not "utter words" when he and the complaining party met with a HR official, since his action in accompanying her "effectively and purposefully communicated his opposition" to the complained of conduct. *Collazo v. Bristol-Myers Squibb Mfg., Inc.,* 617 F.3d 39, 47-48 (1st Cir. 2010); see also *EEOC v. Mountaire Farms, Inc.*, No. 7:13-CV-00182 (E.D.N.C. consent decree

entered Nov. 2013) (Employer settled retaliation claim brought by the EEOC after employee made repeated complaints to supervisors and the HR office about discrimination in violation of Title VII). It is also well established that an employee engages in opposition when an employee who did not initiate a complaint answers an employer's questions about potential discrimination. *Crawford*, 555 U.S. at 277-78 (Supreme Court explains that the Opposition Clause of Title VII extends beyond "active, consistent" conduct that is "instigat[ed]" or "initiat[ed]" by the employee because "[t]here is . . . no reason to doubt that a person can oppose by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statue requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when [the employer] asks a question."). Here it is uncontroverted that : (i) Plaintiff advised Williams to report that she was being sexually harassed, harassed to the point of creating a hostile work environment, and retaliated against to HR [Stanley Aff. ¶ 14] and (ii) Plaintiff answered questions from Defendant's HR representatives related to Williams' complaints. See Memorandum, p. 13. Therefore, applying the holding from *Crawford*, Plaintiff clearly engaged in opposition – a protected activity.

In the Fourth Circuit employees are protected from retaliation when they oppose a hostile work environment that, although not fully formed, is in progress. *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 282 (4ᵗʰ Cir. 2015)("[A]n employee is protected from retaliation when she reports an isolated incident of harassment that is physically threatening or humiliating, even if a hostile work environment is not engendered by that incident alone.") Thus, even if Williams had only reported an isolated single incident of harassment, that report and Plaintiff's support of that report would constitute opposition and correctly be classified as a protected activity if they

reasonably believed a hostile work environment was in progress. That factual showing is clearly made here because it is undisputed that Williams made multiple complaints of harassment and retaliation, which Plaintiff reasonably believed met the legal definition of harassment and retaliation, and opposed the conduct Williams complained of when he was interviewed by Defendant's HR representatives.

For the reasons set forth herein, Plaintiff did engage in protected activity when he opposed conduct he believed was sexual harassment and a hostile work environment targeted at Williams.

**2.      Plaintiff Engaged in Legally Protected Activity When He Participated in the Investigations of Ms. Williams' Complaints**

Defendant argues that Plaintiff's participation in the investigations of Williams' complaints is not protected activity because the complaints took place prior to her termination and did not involve complaints of alleged violations of Title VII. Memorandum, pp. 12-13. In support of that proposition, Defendant cites to *Laughlin v. Metro Washington Airports Auth.*, which held that the activities that constitute participation are statutorily outlined to include: "(1) making a charge; (2) testifying; (3) assisting; or (4) participating **in any manner** in an investigation, proceeding, or hearing under Title VII. Participatory activities are vigorously protected to ensure employees' continuing access to the EEOC and the enforcement process." *Laughlin*, 149 F.3d 253, 259 (4th Cir. 1998) (internal citations and quotation marks omitted). However, Defendant ignores the instructive portion of the *Laughlin* opinion where that court explains the difference between the opposition clause and the participation clause.

> The distinction between participation clause protection and opposition clause protection is significant because the scope of protection is different. Activities under the participation clause are essential to 'the machinery set up by Title VII. As such, the scope of protection for activity falling under the participation clause is

broader than for activity falling under the opposition clause.

*Laughlin*, 149 F.3d 253, n. 4.  Applying that framework to this case, it is clear that the evidence before the court meets the broadly construed interpretation of the participation clause.  Here, the Complaint, deposition testimony of Plaintiff and Williams, and affidavits in support of this response make it clear that Plaintiff participated in a protected activity when he was interviewed by Defendant's HR representatives about Williams' complaints and when he met with EEO representatives on Williams' behalf.  Defendant argues that Plaintiff's participation in an internal investigation is not protected activity; however, *Laughlin* held that "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities" are protected oppositional activities. *Laughlin,* 149 F.3d 253, 259 (4th Cir. 1998).

Defendant's argument that Plaintiff's participation in the internal investigations conducted by its HR representatives into Williams' complaints because they took place prior to Williams' termination is similarly flawed.  See Memorandum, p. 13.  In *Johnson*, which is cited by Defendant, the plaintiff failed to make a claim for retaliation on his charge of discrimination and failed to allege that he engaged in activities that opposed the unlawful employment activities of his employer.  *Johnson v. Portfolio Recovery Assocs., LLC*, 682 F.Supp.2d 560, 571, 578-582. Therefore, the *Johnson* court found that the plaintiff had not engaged in protected activity. In contrast, in this case Williams' charge of discrimination alleged discrimination based on retaliation and specifically says that "she believe[d] that [she] was disciplined and discharged in retaliation for complaining about unprofessional conduct and database irregularities by colleagues in violation of Title VII of the Civil Rights Act of 1964, as amended."  [Arbaugh Decl. Ex. 7]  By specifically alleging she was retaliated against and providing facts to support

that claim, Williams' charge of discrimination is distinguishable from the charge at issue in *Johnson*. Further, the investigations by Defendant's HR representatives were premised on Williams' complaints that she was being sexually harassed, subjected to a hostile work environment by her co-workers constant harassment, and retaliated against for making the complaints – all violations of Title VII. Because Williams' complaints were premised on violations of Title VII, the participation clause is applicable and Plaintiff's conduct is protected activity. Taking the *Johnson* holding to its logical conclusion, if Williams' complaints would be protected by the participation clause, then Plaintiff's participation in the investigation into those claims must also be protected by the participation clause. Defendant does not dispute that Plaintiff was interviewed on multiple occasions about Williams' complaints; and, Plaintiff has consistently said he supported Williams' complaints during those interviews. [Stanley 124:3-25; Stanley Aff. ¶ 16]

Despite Defendant's blanket assertion that Williams claims did not involve violations of Title VII [Memorandum, p. 13], Defendant admits Williams testified that Tarrant "would ask her 'personal things' such as whether she was dating anyone and on one occasion, whether she had ever dated a married man." Memorandum, p. 14. Tarrant regularly asked Williams about her dating life and behaved in a way that made Williams believe that he, her supervisor, was flirting with her and suggesting that they date. [Williams Aff. ¶ 4] Williams made it clear that Tarrant's questions shocked her and made her feel "really awkward." [Williams 73:8-74:3]

By the very nature of the complaints made by Williams and supported by Plaintiff against Tarrant, it is clear that Tarrant asked her those things because she is a woman. Further, Plaintiff believed when he participated in the investigations into Williams' complaints about Tarrant that Williams had been subjected to unwanted sexual advances by Tarrant because of her sex

(female), in violation of Title VII. [Stanley Aff. ¶ 15; Stanley 95:5-10] Actual discrimination in violation of Title VII need not have occurred for a retaliation claim to lie. It is enough that Plaintiff believed Williams was being discriminated against because of her sex when he participated in the investigations into her complaints against Tarrant.

Defendant's suggestion that none of Williams' complaints implicated Title VII because her Charge of Discrimination filed on April 5, 2017 was dismissed on April 13, 2017 is a red herring. [Memorandum, p. 13] Regardless of whether the EEOC found merit in Fryer Williams' charge and the claims made therein is irrelevant to the determination of whether Plaintiff engaged in protected activity when he participated in the investigations into that conduct because it is well settled that the participation clause shields an employee from retaliation regardless of the merit of his EEOC charge. *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000). For the reasons set forth herein, Plaintiff did engage in protected activity when he participated in the investigations conducted by Defendant's HR department and the EEOC into Williams' complaints.

       **3.**       **Plaintiff Engaged in Legally Protected Activity When He Opposed the Unfair and Discriminatory Treatment He Was Subjected to After Engaging in Protected Activity and the Receipt of Sexually Explicit Test Messages**

Plaintiff reported to Defendant's HR representatives that after he was interviewed about Williams' complaints, Tarrant, Cooper, Bailey, and Penny began treating him differently. [Stanley 69:11-17; 85:6-89:18, 120:23; Stanley Aff. ¶ 20; Complaint ¶ 21- 25] He articulated how he was treated differently [see supra p. 5-6] and that he believed the conduct was discriminatory. Plaintiff also complained about the way he was being treated to Smith, his supervisor. These reports to HR and management are opposition activity as described in *Valentin-Almeyda*, 447 F.3d 85 (1st Cir. 2006), and *Mountaire Farms, Inc.*, Case No. 7:13-CV-

00182 (E.D.N.C. 2013).

Defendant concedes that Plaintiff engaged in legally protected activity when he complained that Penny sent him unwanted lewd text messages of male genitalia in violation of Defendant's policies. See Memorandum, p. 12.

### 4. Plaintiff's Engaged in Legally Protected Activity When He Complained of Discrimination and Retaliation by Cooper, Bailey, and Tarrant

Following Plaintiff's opposition to their harassment and discrimination against Williams and participation in investigations into that conduct, Cooper, Bailey, and Tarrant began retaliating against Plaintiff. Defendant, through its HR representatives, was made aware that Plaintiff believed he was being retaliated against and did nothing.

### a. Plaintiff Exhausted His Administrative Remedies As to Cooper, Bailey, and Tarrant

"Before a Title VII plaintiff can bring a formal suit, he must file an administrative charge with the Equal Employment Opportunity Commission (EEOC); this charge frames the scope of future litigation. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005) (citation omitted). Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit. *Id*.; see also *Crocket v. Mission Hosp., Inc.,* 717 F.3d 348, 355 (4th Cir. 2013) (the court found that allegations not contained within the EEOC charge could nonetheless be considered by the court "in the interest of finality.")

In *Chacko*, the plaintiff's charge of discrimination referenced three specific instances of discriminatory language, and his later filed complaint included broader factual allegations referencing different time frames, actors, and discriminatory conduct that spanned his entire 20 year career and the court found that the plaintiff had not exhausted his administrative remedies.

*Chacko*, 429 F.3d at 506 (4th Cir. 2005). In *Crockett*, the court considered whether a seven-day suspension was an adverse employment action even though said suspension was not contained in the employee/plaintiff's EEOC charge. *Crockett v. Mission Hosp., Inc.*, 717 F.3d at 355.

Unlike in *Crockett* or *Chacko*, are substantially similar to those included in his EEOC charge, which specifically included a claim for retaliation. See [Doc. No. 1-1](), Complaint Ex. A. At the time the charge was filed Plaintiff did not know why he had been fired. He noted that he participated in an internal investigation seven months before his termination because he believed that was the true reason for his termination. The investigation he referred to included Williams' claims against Cooper, Bailey, and Tarrant. Further, it is clear that Plaintiff was giving an example of what he disclosed during that investigation when he said, "[a]mong other things, I stated . . ." before making a specific claim against Penny and Autry. See [Doc. No. 1-1](), Complaint Ex. A, p. 2. There was no limiting language used in the description provided by Plaintiff in the charge of discrimination. Alternatively, in the interest of justice, this court should follow the *Crockett* court and find that Plaintiff's claims against Cooper, Bailey, and Tarrant should be considered in the interest of justice.

**b.** **Plaintiff's claims pertaining to his EEOC charge are timely**

It is undisputed that Plaintiff filed his charge of discrimination on October 3, 2017 and that any conduct within 180 days of October 3, 2017 is covered by that filing. See 42 U.S.C. § 2000e-5(e). The 180 day period covered by Plaintiff's charge of discrimination covers all retaliatory conduct between April 6, 2017 and October 3, 2017. The evidence before the court now is that after Williams was terminated in February 2017, Plaintiff continued to be excluded from weekly sales meetings and sales visits with customers. Further, it is obvious that Cooper continued to carry out her retaliatory pattern and practice by the fact that she inserted herself into

the allegations made against Plaintiff regarding the Call, despite not actually participating in that call or having any reason to have been involved in the happenings of the Call.

"[E]vidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Lettieri*, 478 F.3d at 650-651; *Vincent v. N. Carolina Dep't of Transp.*, No. 1:20CV51, 2020 WL 5710710, at *7 (M.D.N.C. Sept. 24, 2020) (finding that even where plaintiff/employee's conclusory allegations of ongoing retaliation between the six and one half month period in which she made an internal complaint to her employer and when her employer terminated her, was sufficient to show temporal proximity between the protected activity and adverse employment action).

Plaintiff's EEOC charge states that approximately seven months prior, he participated in an investigation regarding Williams. The short period between Plaintiff's opposition and participation in February 2017 and the protected period beginning on April 6, 2017, was fraught with additional, ongoing retaliation including, but not limited to, his exclusion from weekly sales meetings, sales visits, and his being required to submit additional reports to his supervisor. Like in *Lettieri* and *Vincent*, Plaintiff has shown sufficient temporal proximity to support his claim that he suffered ongoing, continued retaliation.

        c.    **Plaintiff's complaints about his own treatment were part of the protected activity**

Defendant says Plaintiff's claims regarding his own treatment must fail because Plaintiff did not oppose the harassment by Tarrant, Cooper, and Bailey. Memorandum, p. 19. Defendant goes on to say Plaintiff's exclusion from weekly sales meetings was nothing more than a petty slight not actionable under Title VII. *Id.* That argument ignores the fact that in 2015 Smith, Plaintiff's supervisor, instructed him to show more leadership in the weekly sales meetings as part of Plaintiff's annual performance review. Denying Plaintiff access to those meetings stifled

his ability to meet Smith's expectations for him. Additionally, excluding Plaintiff from sales visits with customers interfered with Plaintiff's ability to do his job and deprived him of opportunities to receive performance based bonuses.

### B. Plaintiff was Subjected to Adverse Actions

The anti-retaliation provisions of Title VII make it unlawful to take a materially adverse action against an individual because they engage in protected activity. The Supreme Court has held that a "materially adverse action" subject to challenge under the anti-retaliation provisions encompasses a broader range of actions than an "adverse action" subject to challenge under the non-discrimination provisions. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); see also *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). That Court went on to say, "[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* An adverse employment action is defined as an action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Vincent*, 2020 WL 5710710, at *5 (M.D.N.C. Sept. 24, 2020) (citing *Wells v. Gates*, 336 F. App'x 378, 383 (4th Cir. 2009); see *Loya v. Sebelius*, 840 F. Supp. 2d 245, 252-53 (D.D.C. 2012) (holding that it was materially adverse to move plaintiff's office to a different building in the same complex); see *Burlington N.*, 548 U.S. at 69-70 (The Supreme Court stated that excluding an employee from a weekly training lunch "might well deter a reasonable employee from complaining".)

This standard is objective but also employee-specific; it does not account for "a plaintiff's unusual subjective feelings," but does account for circumstances such as childcare responsibilities and other out-of-work commitments. *Burlington N. & Santa Fe*, 548 U.S. at 68–69 (distinguishing the failure to invite an employee to lunch on a single occasion from the

repeated exclusion of an employee from a weekly training seminar). A lower degree of adverse action is required to support a retaliation claim than a substantive discrimination claim, because "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67.

Here, Plaintiff being left out of weekly sales meetings and excluded from salve visits are not mere petty slights and minor annoyances like those described in *Evans v. Intern Paper Co.* because these meetings and visits were essential components of Plaintiff's job. It is evident that the meetings were essential components of Plaintiff's job as a sales engineer because Defendant's job description for sales engineers [see Lugo Dep. Ex. 15] which specifically mentions sales engineers attending sale visits and sales meetings where sales visits are discussed and planned.

Defendant erroneously states that all actions taken against Plaintiff were committed by peers and co-workers. Memorandum, p. 21. Tarrant was not Plaintiff's peer or co-worker. He had been Plaintiff's direct supervisor and was a management level employee who was responsible for overseeing/managing the sales team as the Regional Director of Sales. Next, Defendant argues that Plaintiff's claims are weakened because he and Manning were subjected to similar treatment. Memorandum, p. 21. Manning and Plaintiff were both subjected to retaliation, but Manning makes it clear that Plaintiff was treated worse than he was. [Manning Aff. ¶ 18-19] Finally, as mentioned previously, Defendant has acknowledged Plaintiff suffered the ultimate adverse action – termination. Memorandum, p. 19.

## C. There is a Causal Connection Between Plaintiff's Protected Activity and the Adverse Actions He Suffered

Unlawful retaliation is established when a causal connection is established between a materially adverse action and the individual's protected activity. The retaliatory animus need not

necessarily be held by the employer's official who took the materially adverse action; an employer still may be vicariously liable if one of its agents, motivated by discriminatory or retaliatory animus, intentionally and proximately caused the official to take the action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 418-22 (2011); holding that "if a supervisor performs an act motivated by animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable"). Preponderance of the evidence is the evidentiary burden under both causation standards. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 n.4 (2009) (emphasizing that under the "but-for" causation standard "[t]here is no heightened evidentiary requirement"). There can be multiple "but-for" causes, and retaliation need only be "a but-for" cause of the materially adverse action in order for the employee to prevail. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). The Supreme Court has explained the analysis of "but-for" causation when multiple causes exist:

> [W]here A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died. The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so-if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.

*Burrage v. United States*, 134 S.Ct. 881, 888-889 (2014) (internal citation omitted).

In *Rhoads*, the Fourth Circuit held that summary judgment was inappropriate where the plaintiff had rebutted the defendant employer's stated "explanation that Rhoads was fired for excessive unexcused absenteeism" by producing adequate evidence that leave policies were not uniformly applied, thus meeting her burden under McDonnell Douglas. *Rhoads*, 257 F.3d at

393–94. "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)

The Court in *Navy Fed.* found that where one employee was retaliated against after providing support to another employee's claim of discrimination, there was retaliation. *Navy Fed.*, 424 F.3d at 403. The Court found that the issue of whether supervisor's termination was based on poor performance reviews or retaliation for supporting fellow employee's claim of discrimination was an issue of material fact. *Id.*, at 410.

Like in *Navy Fed.*, Plaintiff provided support for a fellow employee's claims against their mutual employer. Thus, the issue of whether Plaintiff's termination was based on an all alleged investigation or in retaliation for providing said support, is an issue of material fact. Further, where excluding an employee from weekly training lunches like in *Burlington*, was enough to support a claim of retaliation, surely Plaintiff's exclusion from weekly sales meetings and regular sales visits, the relocation of his office, the additional reports he was required to file, and ultimately the investigation into the Call that exclusively targeted him to the exclusion of any other employee, amount to retaliation. Arbaugh and Autry adopted Penny's allegations despite knowing Plaintiff has supported Williams' claims against Penny and Autry, knowing Plaintiff had complained about Penny just four days prior to the call.

### D.  Defendant's Reason for Plaintiff's Termination was False and Retaliatory

Plaintiff must show that Defendant's "proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination. Specifically, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Lettieri v. Equant Inc.*, 478 F.3d 640,

646 (4th Cir. 2007) (internal citations and quotations omitted) "Retaliatory animus is sufficient to establish a causal link between [ ] complaint of discrimination and [ ] termination." *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). "A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason. *Bone v. G4S Youth Services, LLC*, 686 F.3D 948, 955 (8th Cir. 2012) (internal citations omitted).

As explained herein, Plaintiff suffered from an environment of retaliatory animus directed at him as the result of his participation in investigations into violations of Title VII at Defendant's Greenville office. The retaliatory environment began in close temporal proximity to his opposition to how Williams was being treated and participation in investigations into complaints made by Williams of violations of Title VII. Like in *Foster*, the retaliation was ongoing up until Plaintiff's termination despite Williams' termination months prior. Furthermore, the alleged investigation of the Call, was exclusively directed at Plaintiff and was premised upon facts supplied by the very employees plaintiff had complained about – Penny and Cooper. It is obvious, that Plaintiff was the victim of illegal retaliation after engaging in a protected activity, and the Defendant's justification for Plaintiff's termination was merely a pretextual ruse.

The crux of Arbaugh's investigation were the allegations made by Penny and "corroborated" by Cooper and the subsequent information Penny purportedly retrieved from whitepages.com. However, Defendant gave no consideration to the fact that Plaintiff's accusers, were among the individuals named in Williams' internal complaints and EEOC charges of discrimination, that Plaintiff participated in the investigations by Defendant's HR representatives into those allegations, that Cooper falsely accused Plaintiff of assaulting her, and Cooper wanted

Defendant's HR to "handle" and "take care of" Plaintiff.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Plaintiff respectfully requests that the Defendant's Motion for Summary Judgment be DENIED, that summary judgment be entered in his favor, and for such other and further relief as the court deems just and proper.

This the 11th day of January, 2021.

The Law Offices of Oliver & Cheek, PLLC

By:    <u>s/Ciara L. Rogers</u>
       Ciara L. Rogers
       N.C. State Bar No. 42571
       PO Box 1548
       New Bern, NC  28563-1548
       Telephone: (919) 987-2024
       Facsimile: (252) 633-1950
       Email:  ciara@olivercheek.com
       *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Ciara L. Rogers, Post Office Box 1548, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 11th day of January, 2021, I served copies of the foregoing pleading on the parties listed below via CM/ECF.

I certify under penalty of perjury that the foregoing is true and correct.

This the 11th day of January, 2021.

The Law Offices of Oliver & Cheek, PLLC

By:    <u>s/Ciara L. Rogers</u>
       Ciara L. Rogers
       N.C. State Bar No. 42571
       PO Box 1548
       New Bern, NC  28563-1548
       Telephone: (919) 987-2024
       Facsimile: (252) 633-1950
       Email:  ciara@olivercheek.com
       *Attorney for Plaintiff*

To:
Ann H. Smith, Esq.      (via CM/ECF)
*Attorney for Defendant*