IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
CIVIL ACTION NO.: 4:19-cv-00030-BO

| | |
|---|---|
| STAN C. STANLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | **AFFIDAVIT OF** |
| v. ) | **STAN C. STANLEY** |
| ) | |
| UNIVERAL CABLE HOLDINGS, INC. ) | |
| d/b/a SUDDENLINK ) | |
| COMMUNICATIONS, ) | |
| ) | |
| Defendant. ) | |

I, Stan C. Stanley, being duly sworn, deposes and says as follows:

1. I am over eighteen years of age, am not under any legal disability, and am competent to make this declaration. My statements in this affidavit are based on my personal knowledge.

2. I was hired as a Field Technician for Cox Communications in July of 2000. I remember when I started because my first child had just been born; and, I was grateful to have full-time employment to support my family.

3. In 2004 I was promoted to WFA Administrator. I reported to Gail Osborne. Between 2004 and 2008, Osborne physically and emotionally abused me. I was afraid to report the abuse because I didn't want to lose my job. My co-workers reported the abuse to human resources; and, I was promoted to a sales engineer position in February 2008. I don't know that I would ever have been able to report the abuse myself.

4. My fears about losing my job if I had reported Osborne's abuse were justified after I was transferred to the sales engineer position when my former second line supervisor, Stephen

Bryan, told me he would not have believed me if I reported Osborne. He also told me that I would have been fired had I made the report. From then on, I knew that to keep my job I needed to handle whatever came up and stay away from human resources.

5. Cox Communications was bought out by Suddenlink.

6. According to my job description, as a sales engineer, I was to accompany account executives and outside sales representatives on sales visits, perform site surveys, make product recommendations, and develop solutions to ensure orders are completed accurately and timely.

7. I received annual performance reviews. In all of my performance reviews I was rated as meeting or exceeding expectations. In 2015, my then supervisor, Sam Smith encouraged me to "assert more leadership in sales meetings."

8. I enjoyed a reputation for being a hard-worker and easy to get along with among my colleagues in the Greenville, North Carolina office for years. I prided myself on being a team player and someone that could be relied on to provide the best experience for Suddenlink customers.

9. In early 2015, there was an open position on the commercial sales team for an account executive. Chris Manning ("Manning") and I were asked to conduct peer reviews of the candidates applying for that position. Seeing this as an opportunity to show more leadership with the sales team, I was happy to participate. We conducted two peer reviews – one internal candidate and one external candidate. The external candidate was Tracy Fryer-Williams ("Fryer-Williams"). I had never met Fryer-Williams before, but after the peer interviews, Chris and I believed she was the better candidate.

10. There was some backlash after Fryer-Williams was hired because Sherry Cooper ("Cooper") and Aaron Penny ("Penny"), account executives on the commercial sales team wanted the internal candidate, LeAnne Carey, to be selected. Before Fryer-Williams even started, Cooper

and Casey Bailey began being rude and unprofessional toward her. In fact, Bailey found a mugshot of Fryer-Williams online, printed it, and hung it up on the Sales Managers door (Mike Tarrant) before Fryer-Williams' first day. I found Bailey's behavior to be unprofessional and childish, so I took the mugshot down.

11. Around the time Fryer-Williams was hired, Mike Tarrant, the then Regional Director of Sales, and supervisor of the commercial sales team in Greenville, announced in a weekly sales meeting that he had to hire Fryer-Williams. He did not explain why he made that comment, but I took it to be a way for him to distance himself from the decision to hire Fryer-Williams. Tarrant, Cooper, Penny, Carey and Bailey were very close.

12. It was Tarrant's job as the Regional Director of Sales to train new account executives or make sure they were trained. However, because Cooper, Bailey, and Penny decided they did not like Fryer-Williams simply because she was hired, Tarrant told me that I needed to devote at least 70% of my time assisting Fryer-Williams with her new hire training and sales. Tarrant told me this when he, Manning, and I were in a meeting. I immediately told Tarrant I did not want to do that because I knew it would cause problems with the other account executives who I had to continue to work with. Tarrant ignored my request.

13. Doing as I was directed by Tarrant, I spent most of my time available for working with account executives going on appointments with Fryer-Williams. I went on nearly every fiber sales visit with her from the time she was hired in March 2015 until she was fired in February 2017. The other sales reps were not scheduling appointments with me per protocol. During that time, we became friends and would discuss work and non-work-related topics.

14. A few months into her employment on the way to a sales call Fryer-Williams told me that Tarrant had asked her about her dating and sex life, which made her uncomfortable. After telling me that Tarrant had done that more than once, I told her she could contact human resources

about her issue. I also shared with her my experience dealing with human resources and encouraged her to think about what she wanted to do and the potential consequences.

15. Later, Fryer-Williams told me she reported Tarrant's behavior to Eric Harris ("Harris"), Vice-President of Sales. Harris was Tarrant's direct supervisor. According to Fryer-Williams, Harris told her to make a report to human resources, which she did. I believed Tarrant's questions to Fryer-Williams about her dating and sex life were inappropriate, unprofessional, and amounted to sexual harassment. I also noticed it was affecting her personally and she feared retaliation and loss of her job.

16. Representatives from human resources interviewed me about Fryer-Williams' reports of sexual harassment against Tarrant. I told them what I knew and that I believed Fryer-Williams had been sexually harassed.

17. Fryer-Williams also confided in me that she believed that Tarrant and other account executives were stealing her customer accounts and manipulating information in Sales Force, the software used to manage customer relationships, assign accounts, and calculate monthly income generation. She expressed frustration that she worked hard to develop customer relationships and then after the work had been done Tarrant would reassign the customer to one of the other account executives, who he was friends with. She believed Tarrant's actions were causing her to not meet her monthly revenue goals and was retaliation for turning him in to HR. I also witnessed Aaron Penny assist Mike Tarrant with changing accounts in Sales Force over to other reps.

18. In addition to the issues Fryer-Williams told me about, I also observed Cooper, Bailey, and Penny yell and curse at Fryer-Williams, start rumors about her, and intentionally make the work place intolerable for her. They did not let up. Everyday there was something said or done.

19. In January or February 2016, William Scott McKittrick ("McKittrick") came to the

Greenville office to interview me, Fryer-Williams, Manning, Tarrant, Penny, Cooper, and Bailey about the office and Fryer-Williams' complaints. During my interview with McKittrick I was open and honest about what I had seen, heard, and what Fryer-Williams had personally told me. I also made it clear that Tarrant, Penny, Cooper, and Bailey treated Fryer-Williams poorly and that I believed their conduct was harassment, bullying, and retaliation. I also believe that their conduct violated the anti-harassment policy.

20. After McKittrick left, Tarrant, Penny, Cooper, and Bailey began to direct their harassing behavior towards me. I knew immediately that McKittrick relayed the information I have given him with Tarrant or one of the account executives because they began repeating points of my statement to McKittrick back to me in a belittling and demeaning manner. They also began cursing and yelling at me, which was new. I had observed them behave this way towards Fryer-Williams, but it was not until after I was interviewed by McKittrick that the harassment was directed toward me.

21. Shortly after the McKittrick interview, Tarrant told Manning and me that we were no longer permitted to attend the weekly sales team meetings. I was very surprised by this decision since I worked so closely with the commercial sales team and Smith had previously told me he wanted me to show more leadership in those meetings.

22. I was interviewed about Fryer-Williams' complaints to human resources representatives several more times between 2016 and February 2017. As time went on, the taunts, rumors that I was having an affair with Fryer-Williams, and name-calling continued.

23. Cooper was so motivated to hurt me that she told outright lies. For instance, Manning, Tarrant, Cooper and I were in an impromptu meeting when Cooper accused me of not responding to a sales appointment. She then accused me of being Fryer-Williams personal sales assistant. I told Tarrant this was inappropriate and to tell her that Tarrant was requiring me to

spend seventy-percent of my time with Fryer-Williams and I didn't recall any request from her for an appointment. We were asked to leave meeting and Cooper and I went to an opened office and I opened my laptop where I was unable to find any meeting invite. While looking up her request she put her finger in my face and was verbally attacking me. She then abruptly left the room screaming I attacked her. I was told that she went to Fryer-Williams cubicle and said it must be nice to have a personal sales assistant. She continued to tell anyone in ear shot that I attacked her and that she was going to report me to human resources so they could "handle me." I believed Cooper was trying to get me fired.

24. Fryer-Williams heard and observed a Cooper yelling that I attacked her and told me to report Cooper to human resources and the ethics hotline. Ultimately, Fryer-Williams reported Cooper to human resources and Cooper's claim was found to be not true. I was not disciplined because of Cooper's false report, but Tarrant did confront me about the allegations. I became more fearful that I could be the victim of false reports at any time. It was nerve-racking.

25. Shortly thereafter, Tarrant was fired. Tarrant was replaced by John Autry ("Autry") as the supervisor of the commercial sales team in Greenville, North Carolina. Autry continued to exclude Manning and me from the weekly sales meetings and Cooper, Bailey, and Penny continued to do the same things that Fryer-Williams and I had already complained about. In fact, things seemed to escalate again because we were blamed for Tarrant being fired. Tarrant, Autry, Cooper, Bailey and Penny continued to stay in touch and have lunch with Tarrant even after he was terminated and went to work with a competitor.

26. Fryer-Williams began documenting everything that happened in the office and continued to make complaints to human resources. Nothing productive came from me making reports to human resources, so I stopped. However, anytime I was interviewed or asked about what was going on by human resources or management, I would be forthright about what I knew

despite my constant fear that I'd be fired.

27. In late 2016, I asked to move into Tarrant's old office, after it had been vacant for several months. I was initially told that I could move in to the office, but then, as I was in the process of moving, I was told I could not move. There was no reason the office could not be used.

28. In February 2017, Fryer-Williams was fired. I believed that her termination was directly related to the complaints she made to human resources. She had proven that there were some irregularities with the way Tarrant was assigning and managing customer accounts, but that did not matter.

29. After being fired, Fryer-Williams told me she was going to file a complaint with the Equal Employment Opportunity Commission ("EEOC"). Because I believed she had been harassed and retaliated against, I told her that I would go with her to the EEOC office, which I did. I was there as moral support for her and as a witness to what happened.

30. Also after Fryer-Williams was fired, we remained friends and stayed in contact. She would call me; and, I gave her son guitar lessons. I congratulated her on being hired by CenturyLink as an account executive and wished her well.

31. In the office, I continued to be excluded from the weekly sales meetings and going on sales visits with account executives unless they could not help but to involve me. Additionally, I was required to start submitting reports detailing my time in the office to my supervisor, Smith. No other sales engineer was required to submit these reports.

32. Smith contacted me about an account that was way behind schedule for connecting the customer's services. It turned out that the account was one that had belonged to Fryer-Williams, but had not been completed after she was no longer employed by Suddenlink. Smith asked me if I still kept in touch with Fryer-Williams and when I said I did, he asked me to reach out to her to help with the customer's account. I was reluctant to do that because my friendship

with Fryer-Williams had caused so many issues, but eventually agreed to reach out to her. When I asked Fryer-Williams for assistance on the account, she immediately provided the information needed via email. With Fryer-Williams' help, that project was completed for Suddenlink's benefit. Local Sales Management (Autry) was upset at me for contacting Fryer-Williams and angrily confronted me even though my upper management asked me to contact Fryer-Williams.

33. On August 21, 2020, I was in my office with Manning. Penny came in and asked whether we wanted to see something funny and sent us a picture of male genitalia. I told Penny not to send those kinds of messages to my work cell phone because I knew they violated policy and my work cell phone could be monitored. At this point, I was very careful to not do anything that could be perceived as a reason to fire me.

34. Despite being kept off of many accounts and out of sales visits, I was asked to help with preparing an e-rate bid for a Beaufort County Public Schools project. E-rate bids are different than any other bids, so this was a new and unique opportunity.

35. As the bid deadline was approaching, I believed the costs were high, so I asked Dedric Staton ("Staton"), a project development manager, to schedule a meeting for the various departments that were working on the bid to discuss the costs related to running fiber through a North Carolina Department of Transportation right-of-way. Staton scheduled the call for August 25, 2017 at 1:00pm using Microsoft Lync and circulated the invite via email.

36. At the scheduled time of the call, I was at home having lunch with my children. I did not need to participate in the call and expected that once the persons who would make the calculation on how much it would cost to run the fiber and what process would be used to run the fiber, they would relay that information to me, so I could continue working on the bid.

37. Manning called me and told me that they were waiting on me to join the call. I told

him I was having lunch with my kids, but would dial in. My cell phone died while I was in the house, so I went to my truck, plugged in my cell phone to charge, and started driving back to the office. My phone powered back on when I was on my way, so I dialed back in to the call.

38. When I arrived at the office, I went directly to Manning's office, disconnected the call on my cell phone, and participated in the remainder of the call sharing Manning's office phone. As far as I knew, there was nothing unusual about the call, so when it was completed, I went on about my day.

39. Also, on August 25, 2017, I discovered that Penny had sent a second picture of male genitalia to my work cell phone on August 21, 2017, which I had not previously seen. I called Smith and expressed my frustration with Penny. On August 28, 2017, I sent Smith an instant message asking him to do something about Penny. I followed up with an email to Smith on August 29, 2017 out of frustration that Penny and other seemed to get away with violating policies.

40. I was later told by Duska Arbaugh ("Arbaugh"), Regional Director of Human Resources that I had been accused me of giving Fryer-Williams proprietary and/or confidential information so she could dial in to the August 25, 2017 call. I was shocked because I did not know where these allegations were coming from, but it made sense when Arbaugh told me the allegations had been made by Penny and Cooper since Cooper had already made false accusations against me, I had just called Penny out about sending me text messages that violated company policy, as well as sending emails up to HR showing that Penny was manipulating customer contracts for personal gain and Penny and Cooper were friends.

41. I did not give Fryer-Williams any confidential or proprietary information belonging to Suddenlink related to the Beaufort County Public Schools bid or anything else.

42. Arbaugh came to the Greenville office and interviewed me and others about the August 25th call. Her questions to me focused on whether I still kept in touch with Fryer-Williams.

I acknowledged I did.

43. I continued to work on the bid for the Beaufort County Public Schools project and maintained by access to company files and information until September 28, 2017. On September 28, 2017, I was called into a meeting with Peggy Wooten. When I got to Wooten's office, Smith and Arbaugh were on the telephone. Arbaugh told me the decision had been made to end my employment with Suddenlink. I was shocked. I asked her why, but she refused to give me a reason and told me to "get a subpoena." After that meeting, I left the Greenville office.

44. On October 3, 2017, I filed a charge of discrimination with the EEOC because I believed I had been discriminated and retaliated against.

AND FURTHER THE DECLARANT SAYETH NOT.

I declare under penalty of perjury that the foregoing is true and accurate. Executed on January 11, 2021.

_____
STAN C. STANLEY

Sworn to and subscribed before me
this the 11 day of January, 2021.

_____
Notary Public

K. Dawn Freeman
Handwritten Name of Notary Public

My Commission Expires: 1-16-2024

K. DAWN FREEMAN
Notary Public, North Carolina
Craven County
My Commission Expires
1-16-2024