**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**
**FILE NO.: 4:19-cv-00030-BO**

| | | |
|---|---|---|
| **STAN C. STANLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **PLAINTIFF'S OBJECTION TO** |
| **v.** | ) | **DEFENDANT'S STATEMENT OF** |
| | ) | **UNDISPUTED MATERIAL FACTS** |
| **UNIVERSAL CABLE** | ) | |
| **HOLDINGS, INC. d/b/a** | ) | |
| **Suddenlink Communications,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff Stan C. Stanley objects to Defendant Universal Cable Holdings, Inc.'s Statement of Undisputed Facts ("Statement") [Doc. No. 41], filed in support of its Motion for Summary Judgment [Doc. No. 39] (the "Motion"). The Statement fails to limit the "facts" to those that are "material" to the Motion. See *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986) (explaining that a fact is "material" only if it "might affect the outcome of the suit under the governing law"). Rather than providing only material facts, Defendant offers, eighty-five paragraphs including general background information that is not "material." Instead many of the alleged facts are argumentative and self-serving.

Pursuant to Local Civil Rule 56.1(a)(2), Plaintiff respectfully submits the following paragraphs of Defendant's Statement as disputed or immaterial:

1.      Universal Cable Holdings, Inc. d/b/a Suddenlink Communications is a corporation organized and existing under the laws of the state of Delaware. It is authorized do business in North Carolina and does conduct business activities in

North Carolina. [Doc. No. 12, p. 2]

       **PLAINTIFF'S RESPONSE:** Admitted

2.      Suddenlink is a subsidiary of Altice USA which specializes in cable television, highspeed internet, broadband phone, home security, and advertising for residential and commercial customers. [Arbaugh Decl. ¶ 4]

       **PLAINTIFF'S RESPONSE:** Admitted.

3.      Suddenlink has several facilities in North Carolina, including a location in Greenville, North Carolina, where Plaintiff worked. [Stanley 43:4-10]

       **PLAINTIFF'S RESPONSE:** Admitted.

4.      Plaintiff began working with a predecessor of Suddenlink on July 9, 2001. [Arbaugh Decl. ¶ 5]

       **PLAINTIFF'S RESPONSE:** Plaintiff disputes this purported fact. Plaintiff was hired in July of 2000 following the birth of his first child. [Stanley Aff. ¶ 2]. See also App'x F of Suddenlink's Bid to Beaufort County Schools, produced as Suddenlink 002290.

5.      In February 2008, Plaintiff became a sales engineer—a position he held until his termination. [Arbaugh Decl. ¶ 6; Exhibit 1]

       **PLAINTIFF'S RESPONSE:** Admitted.

6.      As a Sales Engineer, Plaintiff performed a variety of duties, including accompanying Account Executives on sales visits; assisting Account Executives with developing proposals; and acting as liaison between engineering and sales in determining costs and profitability of proposed projects. [Arbaugh Decl. ¶ 6; Exhibit 2]

**PLAINTIFF'S RESPONSE:** Plaintiff admits he performed the duties articulated, but that list is not exhaustive.

7.    Plaintiff reported to Sam Smith who was located in Texas, and Smith reported to Jose Lugo in New York. [Arbaugh Decl. ¶ 7]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that he began reporting to Sam Smith in 2015. The designation of who Sam Smith's supervisor is/was is not material to this case and not properly included in accordance with L.C.R. 56(a)(1).

8.    In February 2015, Suddenlink hired Tracy Fryer Williams ("Williams") as an Account Executive in Greenville, North Carolina. [Arbaugh Decl. ¶ 8] At the time of her hire, she was supervised by Michael Tarrant ("Tarrant"). [Arbaugh Decl. ¶ 9]

**PLAINTIFF'S RESPONSE:** Admitted.

9.    Other Account Executives in Greenville whom Tarrant supervised included Sherry Cooper ("Cooper"), Casey Bailey ("Bailey"), and Aaron Penny ("Penny"). [Arbaugh Decl. ¶ 10]

**PLAINTIFF'S RESPOSNE:** Admitted.

10.    The Account Executives relied on Plaintiff and Chris Manning ("Manning"), Project Development Manager, for sales support. [Autry Decl. ¶ 6]

**PLAINTIFF'S RESPONSE:** Admitted.

11.    While employed with Suddenlink, Williams made multiple complaints with Human Resources regarding her treatment in the Greenville office. Specifically, Williams complained that her co-workers and supervisor did not like her and that

she was "bullied" and "harassed" by them. [See, e.g., Arbaugh Decl. ¶ 11; Exhibits 3-6] She also complained that accounts were stolen from her and sales leads were unfairly distributed. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits the statements of paragraph 11 and adds that Williams also reported being sexually harassed by Tarrant. [Stanley Aff. ¶ 15, 17, 19; Fryer-Williams Aff. ¶ 4]

12. Plaintiff encouraged Williams to report comments Tarrant made to Williams about "personal things" such as whether she was dating anyone and on one occasion, whether she had ever dated a married man; Plaintiff admitted he did not report this conduct to Human Resources. [Stanley 95:6-96:12]

**PLAINTIFF'S RESPONSE:** Admitted.

13. Plaintiff testified he complained in May 2015 to Tarrant that Cooper and Bailey were "harassing" Williams. [Stanley 72:24-73:10]

**PLAINTFF'S RESPONSE:** Admitted.

14. Plaintiff testified he reported that Cooper and Bailey were making "ugly" comments about Williams being a "stupid fucking bitch" who did not know how to sell. [Stanley 75:16-76:2]

**PLAINTIFF'S RESPONSE:** Admitted.

15. After this initial complaint, Plaintiff continued to report to Tarrant issues involving Cooper and Bailey's treatment of Williams, including them trying to take work from Williams in Salesforce, a program used to manage sales and leads. [Stanley 79:3-9]

**PLAINTIFF'S RESPONSE:** Admitted.

16.  He also shared that Cooper and Bailey made a lot of "not very nice, not positive statements" about Williams that was just "really stupid stuff" and not sexual harassment. [Stanley 79:10-80:6; 81:9-13]

     **PLAINTIFF'S RESPONSE:** Admitted.

17.  Despite Williams' multiple complaints, Human Resources personnel for the most part found her complaints to be unsubstantiated. For example, in the Investigative Report completed by Patty Brooke on January 2, 2017, she found "there seems to be unprofessional comments from [Williams, Cooper, and Bailey] that need to be addressed." [Arbaugh Decl. ¶ 11; Exhibit 6]

     **PLAINTIFF'S RESPONSE:** Plaintiff disputes this purported fact because it is an argumentative conclusion provided by Defendant. Further, Plaintiff has personal knowledge of and provided information during interviews with human resources to substantiate Ms. Fryer-Williams' complaints. [Stanley Aff. ¶ 16]

18.  Brooke recommended that "leadership set professional expectations to the team and possibly look at the individuals on the team complete a civil treatment for employee's training." [Arbaugh Decl. ¶ 11, Exhibit 6]

     **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 6 of Arbaugh's Declaration includes recommendations by Brooke. This fact is immaterial and not properly included in accordance with L.C.R. 56(a)(1)

19.  As part of the investigation of Williams' complaints, Plaintiff was interviewed by Human Resources. [Stanley 24:9-25:17; 69:1-10]

     **PLAINTIFF'S RESPONSE:** Admitted.

20.     Plaintiff testified that as a result of his "support" of Williams, he suffered alleged retaliation which included: others making unprofessional comments about him behind his back; being excluded from sales meetings; keeping him from going on sales calls; and having his office moved. [Stanley 54:69:11-17; 85:6-89:18]

**PLAINTIFF'S RESPONSE:**  Plaintiff admits that the statement above includes some of the examples of retaliation he articulated, but is not the complete list of ways Stanley said he was retaliated against. [Stanley Aff. ¶ 23, 25, 31, 34, 44].

21.     Plaintiff admitted he was not terminated after any of these interviews with Human Resources. [Stanley 31:12-19]

**PLANTIFF'S RESPONSE:** Defendant's statement is misleading.  Plaintiff was asked a series of questions related to different interviews and investigations by human resources.  As written, there is no context to Plaintiff's testimony and it is being mischaracterized as written.

22.     Plaintiff did not receive any sort of disciplinary action and his pay was not reduced following his participation in the investigations of Williams' complaints. [Arbuagh Decl. ¶ 15]

**PLAINTIFF'S RESPONSE:**  Plaintiff admits his pay was not reduced following his participation in the investigation of Williams' complaint.  Plaintiff disputes the remainder of this purported fact.  Plaintiff was terminated, a disciplinary action, following his participation in the Human Resources investigation of Williams' complaints.  [Stanley Aff. ¶ 16, 20, 22, 26, 42, 43; Complaint ¶¶ 45-47]

23.     Both Plaintiff and Williams admitted that Manning was treated similarly to
        Plaintiff. For example, Manning's office was moved, he was excluded from sales
        meetings, and he was not asked to go on sales calls. [Stanley 87:4-19, 106:10-
        107:9; Williams 68:10-69:10, 99:6-25]

        **PLAINFIFF'S RESPONSE:** Plaintiff admits that Manning's office was
        moved and that he was excluded from sales meetings and sales calls.  Manning,
        Williams, and Plaintiff all stated that Plaintiff was treated worse than Manning.
        [Manning Aff. ¶ 19]

24.     According to Williams, Tarrant moved Plaintiff and Manning's offices to allow
        the sales team to have better access to Plaintiff and Manning. [Williams 64:1-9]

        **PLAINTIFF'S RESPONSE:**  Plaintiff admits that Tarrant said the move
        was for the sales team to have better access to Plaintiff and Manning.

25.     Ultimately, Williams' employment was separated after she failed repeatedly to
        meet her sales quota month over month. [Arbuagh Decl. ¶ 12]

        **PLAINTIFF'S RESPONSE:** Plaintiff admits that Williams's
        employment with Defendant was terminated and the reason Defendant told
        Williams she was separated from her employment with Defendant was because
        she failed to meet her sales quota.  Williams and Plaintiff believe the separation
        was retaliatory because of the various complaints she made to human resources
        and the ethics hotline.  [Williams Aff. ¶ 19; Stanley Aff. ¶ 28]

26.     On April 5, 2017, Williams filed an EEOC Charge alleging retaliation "for
        complaining about unprofessional conduct and database irregularities." [Arbaugh
        Decl. ¶ 13; Exhibit 7]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Williams filed a charge of discrimination on April 5, 2017. The best evidence of the allegations in that charge are the charge itself, not Arbaugh's summary of the document.

27.    Eight days later, the EEOC dismissed this Charge of Discrimination with a no cause determination on April 13, 2017. [Williams Depo.; Exhibit 8, Plaintiff 000227]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that a Notice of Right to sue was filed related to Williams' charge of discrimination on April 13, 2017. The best evidence of information in the document is the document itself. Further, this fact is immaterial and not properly included in accordance with L.C.R. 56(a)(1).

28.    The following month, Williams began working for CenturyLink, a direct competitor of Suddenlink, as a sales executive for new business in eastern North Carolina. [Williams Depo. 30:4-15]

**PLAINTIFF'S RESPONSE:** Admitted.

29.    After Williams' termination, Plaintiff admitted that the alleged retaliation abated somewhat although he contended he was still excluded from sales calls and required to submit new reports to his supervisor. [Doc. No. 1, ¶ 38]

**PLAINTIFF'S RESPONSE:** Defendant purports to summarize a statement made in the Complaint. The best evidence of what Plaintiff said in the Complaint is the Complaint not Defendant's summary of a statement made in the Complaint.

30.    Plaintiff requested a call (the "Call") on Friday, August 25, 2017, to discuss a bid

for Beaufort County Schools ("BCS"). [Stanley 27:2-13; 28:23-24]

> **PLAINTIFF'S RESPONSE:** Plaintiff admits that he requested a call be scheduled, but did not request that the call take place specifically on August 25, 2017. [Stanley Aff. ¶ 35]

31. BCS had published a request for proposals ("RFP") from service providers for an E-Rate project for the school system. [Autry 76:4-77:4]

> **PLAINTIFF'S RESPONSE:** Admitted.

32. This E-Rate proposal was one of the most complex and competitive opportunities Suddenlink would compete for on a yearly basis. [Autry 77:6-81:22]

> **PLAINTIFF'S RESPONSE:** Admitted.

33. The purpose of the Call was to discuss project costs so Plaintiff could calculate the initial rate of return ("IRR") for the project. [Stanley 28:7-20]

> **PLAINTNIFF'S RESPONSE:** Admitted.

34. Dedric Staton, a Suddenlink employee, set up the call using Microsoft Lync ("Lync"), a software program Suddenlink used to organize and manage participation in conference calls. [Stanley 29:6-9; Autry 67:14-24]

> **PLAINTIFF'S RESPONSE:** Admitted.

35. The Lync program permits invitees to participate either by using a dial-in number and conference code, or by connecting through the Lync website via an online link. [Autry 64:13- 23]

> **PLAINTIFF'S RESPONSE:** Admitted.

36. All attendees invited to the Call were Suddenlink employees. [Autry Decl ¶ 8]

> **PLAINTIFF'S RESPONSE:** Admitted.

37.    At the beginning of the Call, the leader called the roll to confirm attendees.
[Arbaugh Decl. ¶ 17; Exhibit 10]

**PLAINTIFF'S RESPONSE:** This purported fact is not material and not properly included in accordance with L.C.R. 56(a)(1).

38.    When roll was taken, Penny noticed Plaintiff did not initially respond when his name was called. [Arbaugh Decl. ¶ 17; Exhibit 10]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 10 purports to be an Incident Report that summarizes statements by, among other people, Penny. Plaintiff disputes the assertion that the content of the Incident Report is a complete and accurate transcription of the conversations recorded therein. The best evidence of the conversations summarized in the Incident Report would be Penny's testimony regarding the conversation. [See Stanley Aff. ¶ 37; Manning Aff. ¶ 29]

39.    Manning, another attendee on the Call, whose cubicle was near Penny's, separately called Plaintiff (who was not in the office at the time) to ensure his attendance on the Call. [Stanley 29:13-19] When Plaintiff answered his phone, he told Manning his phone was dying, but he would jump on the call. [Id.] Plaintiff then got into his vehicle, plugged in his phone, called into the Call, and drove to the office where he went to Manning's office to complete the call. [Id.]

**PLAINTIFF'S RESPONSE:** Admitted.

40.    While Manning was on speakerphone with Plaintiff asking Plaintiff to join the call, Cooper overheard the conversation. [Arbaugh Decl. ¶ 18; Exhibit 12] She walked over to Penny's desk where she looked at the computer which showed the

individuals called into the call. [Id.] She saw Williams' name as being a participant on the Call. [Id.]

> **PLAINTIFF'S RESPONSE:** Plaintiff admits that Cooper said she overheard the conversation, but is without knowledge to know if that is true.

41. After the Call, both Cooper and Penny reported to their supervisor, John Autry, that they had observed Williams' name on the conference bridge. [Arbaugh Decl. ¶ 18; Exhibits 11 and 12].

> **PLAINTIFF'S RESPONSE:** Admitted.

42. Autry requested that both Cooper and Penny give him a written statement outlining what they had witnessed. [Arbaugh Decl. ¶ 19; Exhibit 13]

> **PLAINTIFF'S RESPONSE:** Admitted.

43. Once Autry received the statements, he reported the information to his supervisor, Michael Shaffer. [Autry 91:22-92:3]

> **PLAINTIFF'S RESPONSE:** Admitted.

44. Even though he had never dealt with a situation like this before, Autry felt obligated to report the incident because the purpose of the Call was to discuss confidential and proprietary trade secret information on how to respond to the Beaufort County Schools E-Rate RFP—a very competitive process. [Autry 94:12-97:1]

> **PLAINTIFF'S RESPONSE:** Plaintiff admits that Autry said he had never dealt with a "situation like this."  Plaintiff's evidence disputes the assertion that the Call was to discuss confidential and proprietary trade secret information. [Complaint, ¶ 40; Manning Aff. ¶ 30]

45.     On Monday, August 28, Smith received an email from Steve Tulloh, Shaffer's supervisor, requesting that Smith obtain information from Plaintiff related to the August 25 Call. [Arbaugh Decl. ¶ 17; Exhibit 10]

        **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 10 purports to be an Incident Report that summarizes statements and events.  Plaintiff disputes the assertion that the content of the Incident Report is a complete and accurate summary of all events.  The best evidence of an email from Tulloh to Smith would be a copy of the email.

46.     After receiving the email, Smith contacted Plaintiff to speak with him regarding the Call. [Id.]

        **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 10 purports to be an Incident Report that summarizes statements and events.  Plaintiff disputes the assertion that the content of the Incident Report is a complete and accurate summary of all events.  The best evidence of what Smith did after allegedly receiving an email would be Smith's testimony or a statement by Smith as to his actions.

47.     During this conversation, Plaintiff revealed for the very first time that Penny had sent him an "inappropriate" video (the "Images") to his work cell phone a week earlier on August 21. [Id.; Stanley 147:19-148:9; Arbaugh Decl. ¶ 23; Exhibit 15].

        **PLAINITFF'S RESPONSE:**  Plaintiff disputes this purported fact.  Plaintiff verbally complained to John Autry at the time the video was sent. [Stanley Dep. 148:17-20]

48.     Smith questioned why Plaintiff had not reported this immediately as required by

Company policies. [Arbaugh Decl. ¶ 17; Exhibit 10]

**PLAINTIFF'S RESPONSE:** Plaintiff disputes this purported fact. Plaintiff's testimony was that he did report the text message at the time it was sent in accordance with Company policy. [Stanley Dep. 148:17-20]

49.     Plaintiff indicated he had just noticed the video and thought someone else would have reported it. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff disputes this purported fact because it is misleading. Plaintiff complained to John Autry about the text message he saw on August 21, 2017. On August 25, 2017, Plaintiff realized a second text message had been sent. Plaintiff admits he thought someone else who witnessed the exchange might also report the incident to Human Resources. [Stanley Dep. 148:17-20]

50.     Upon receipt of this complaint from Plaintiff, Smith reported this information to Lugo, his supervisor, who escalated the issue up to Human Resources. [Lugo 24:15-27:22]

**PLAINTIFF'S RESPONSE:** Admitted.

51.     In addition to reporting the Images to his supervisor, Plaintiff also reached out to Penny's supervisor, Autry, to report that Penny had shared inappropriate materials with him and that he was going to report this to HR. [Autry 162:2-20]

**PLAINTIFF'S RESPONSE:** Admitted.

52.     Eventually, Duska Arbaugh, Regional Director of Human Resources, was tasked with investigating: (1) the August 25 Call; and (2) Plaintiff's complaint about the Images. [Arbaugh 17:14-16; Arbaugh Decl. ¶¶ 16 and 23]

**PLAINTIFF'S RESPONSE:** Admitted

53. On August 30, 2017, Autry, Penny's direct supervisor, spoke with Penny concerning Plaintiff's allegation that Penny shared the Images with Plaintiff on August 21, 2017. [Autry 166:7-13; Arbaugh Decl. ¶ 24; Exhibit 16]

    **PLAINTIFF'S RESPONSE:** Admitted.

54. Penny indicated he had received a video from a friend (not a Suddenlink employee) titled "Eclipse." [Id.]

    **PLAINTIFF'S RESPONSE:** This fact is immaterial and not properly included in accordance with L.C.R. 56(a)(1).

55. Penny admitted to showing the video to Manning and Plaintiff on the morning of August 21, 2017. [Id.]

    **PLAINTIFF'S RESPONSE:** Admitted.

56. Penny stated that he, Plaintiff, and Manning often willingly shared "Adult Humor" among themselves, and that Penny had been the recipient of similar material from Plaintiff in the past. [Id.]

    **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 16 purports to be an email strand from John Autry to Duska Arbaugh that summarizes statements and events. Plaintiff disputes the assertion that the content of the email is a complete and accurate transcription of a conversation between Autry and Penny. The best evidence of what Penny said would be Penny's testimony.

57. When Penny showed the Eclipse video to Plaintiff, Plaintiff said the video was "hilarious" and asked Penny to send it to him so he could share it with his son. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 16 purports to be an email strand from John Autry to Duska Arbaugh that summarizes statements and events. Plaintiff disputes the assertion that the content of the email is a complete and accurate transcription of a conversation between Autry and Penny. The best evidence of what Penny said would be Penny's testimony.

58. When Penny asked for Plaintiff's personal cell phone number, Plaintiff instructed Penny to send the Images to his work cell phone. [Id.]

    **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 16 purports to be an email strand from John Autry to Duska Arbaugh that summarizes statements and events. Plaintiff disputes the assertion that the content of the email is a complete and accurate transcription of a conversation between Autry and Penny. The best evidence of what Penny said would be Penny's testimony. [See Manning Aff. ¶ 26; Stanley Aff.¶ 33]

59. Penny admitted sending the video to Plaintiff's work phone. [Id.]

    **PLAINTIFF'S RESPONSE:** Admitted.

60. Penny further acknowledged his behavior was inappropriate and committed to not participating or being involved in the type of behavior moving forward. [Arbaugh Decl. ¶¶ 24 and 25; Exhibits 16 and 17]

    **PLAINTIFF'S RESPONSE:** Admitted.

61. Autry sent Arbaugh an email summarizing his discussion with Penny. [Autry 162:2- 13; Arbaugh Decl. ¶24; Exhibit 16]

    **PLAINTIFF'S RESPONSE:** Plaintiff admits that Autry sent Arbaugh an email purporting to summarize his discussion with Penny. Plaintiff disputes the

assertion that the content of the email is a complete and accurate transcription of a conversation between Autry and Penny. The best evidence of what Penny said would be Penny's testimony.

62. As part of the investigation of this complaint, Arbaugh spoke with Plaintiff about his allegations. [Arbaugh 96:9-97:3]

    **PLAINTIFF'S RESPONSE:** Admitted.

63. Following the investigation, Penny received a corrective action for sharing inappropriate material in the workplace. [Arbaugh Decl. ¶ 25; Exhibit 17; Arbaugh 97:2-3]

    **PLAINTIFF'S RESPONSE:** Admitted.

64. Plaintiff did not receive any disciplinary action in connection with these events. [Arbaugh Decl. ¶¶ 15 and 26]

    **PLAINTIFF'S RESPONSE:** Admitted.

65. As part of the investigation of the Call, Arbaugh pulled company cell phone records for each attendee from August 4, 2017 through August 30, 2017. [Arbaugh Decl. ¶ 22; Exhibit 14]

    **PLAINTIFF'S RESPONSE:** Plaintiff disputes this assertion. Williams testified that she does not know what her land line telephone number was in August 2017. [Williams 268:7-12]

66. Based on these records, only Plaintiff's call log could be tied to Williams' personal cell phone and land line. [Id.]

    **PLAINTIFF'S RESPOSNE:** Defendant's evidence does not support this assertion. Neither Plaintiff nor Defendant have provided credible evidence of

what Williams' land line telephone number was in August 2017.

67. When Arbaugh analyzed these records, she found that Plaintiff and Williams had a total of 889 minutes of talk time with each other over a two-week period. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Arbaugh testified that she calculated 889 minutes of talk time between Plaintiff and Williams over a two week period. The best evidence of the talk time between Plaintiff and Williams are the telephone records.

68. In fact, Plaintiff and Williams talked on three separate occasions on the day of the Call. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Arbaugh testified that Plaintiff and Williams spoke on three occasions on the day of the Call. The best evidence of how many times Plaintiff and Williams spoke on August 25, 2017 are the telephone records.

69. Despite this evidence, Arbaugh did not limit her investigation to cell phone records. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Arbaugh reviewed information other than the cell phone records for Plaintiff's Company issued cell phone. The manner in which the statement is phrased is argumentative.

70. She also requested email and Instant Message ("IM") searches, badge swipe information, and explored whether the Company could verify Plaintiff's location through GPS information. [Id.]

**PLAINTIFF'S RESPONSE:** Admitted.

71. In addition, Arbaugh collected information pertaining to the numbers that dialed

into the meeting and confirmed as part of her investigation that a call did come in from Williams' home land line. [Arbaugh 107:23-108:3; 119:7-21]

**PLAINTIFF'S RESPONSE:** Plaintiff disputes this purported fact. There is no credible evidence in the record of what Williams' land line telephone number was in August 2017. Further, Penny and Cooper reported they saw Williams' name on the call bridge not a telephone number. [Autry Dep. Ex. 9; Autry Dep. 147: 6-18] [Autry Dep. 190:14 – 196:23; Autry Dep. Ex. 12-14; SUDDENLINK_000453-461]

72.    At her deposition, Williams admitted that she had a telephone landline at this time although she professed to be unable to remember the number. [Williams Depo. 12:8-15]

**PLAINITFF'S RESPONSE:** Plaintiff admits that Williams admitted to having a land line in August 2017. However, the statement is phrased in an argumentative manner that distorts Williams' testimony.

73.    After gathering this documentation, Arbaugh conducted one-on-one interviews of attendees on the Call. [Arbuagh 109:23-12]

**PLAINTIFF'S RESPONSE:** Admitted.

74.    Of the individuals interviewed, Plaintiff was the only attendee who admitted to having an outside relationship with Williams. [Arbaugh Decl. ¶ 22; Exhibit 14]

**PLAINTIFF'S RESPONSE:** Arbaugh's interview questions did not ask whether the interviewees had any contact with Tracy Fryer Williams and if yes, when they had contact. Three pages of interview notes acknowledged contact with Williams. [Arbaugh Dep. Ex. 24]

75.    When Arbaugh asked Plaintiff if he spoke to Williams on the day of the Call, he indicated he was not sure but "maybe." [Id.]

   **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 14 to Arbaugh's Declaration purports to be an Investigative Report that summarizes statements and events. Plaintiff disputes the assertion that the content of the Investigative Report is a complete and accurate summary of events and transcription of conversations.

76.    Arbaugh then shared Plaintiff's cell records reflected he spoke to Williams in the morning, in the afternoon before the Call, and later in the evening for a total of 74 minutes that day. [Id.]

   **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 14 to Arbaugh's Declaration purports to be an Investigative Report that summarizes statements and events. Plaintiff disputes the assertion that the content of the Investigative Report is a complete and accurate summary of events and transcription of conversations.

77.    When Arbaugh asked where he was during the Call, Plaintiff said he was parked in his driveway on his cell phone. [Id.]

   **PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 14 to Arbaugh's Declaration purports to be an Investigative Report that summarizes statements and events. Plaintiff disputes the assertion that the content of the Investigative Report is a complete and accurate summary of events and transcription of conversations.

78.    During the interview, Plaintiff stated that he knew how "it looked," but he did not

give Williams the number for the call. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Exhibit 14 to Arbaugh's Declaration purports to be an Investigative Report that summarizes statements and events. Plaintiff disputes the assertion that the content of the Investigative Report is a complete and accurate summary of events and transcription of conversations.

79. Based on this investigation, Arbaugh prepared a report in which she concluded there was reasonable suspicion to believe that Plaintiff either provided the call-in number to Williams or that Plaintiff was with Williams during the Call. [Id.]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Arbaugh prepared a report and concluded that Plaintiff provided the call-in number to Williams. However, Plaintiff disputes Arbaugh made that conclusion based on the evidence collected during her alleged investigation. Arbaugh concluded Plaintiff had given Williams the call-in information about Plaintiff before the investigation was complete. [See Arbaugh Dep. Ex. 25]

80. Suddenlink's Employee Handbook explicitly prohibits employees from sharing confidential information. [Arbaugh Decl. ¶ 27; Exhibit 18]. Employees who violate this policy are subject to disciplinary action, including immediate termination. [Id.]

**PLAINTIFF'S RESPONSE:** Admitted.

81. The evidence of the investigation led her to believe Plaintiff's relationship with Williams posed a risk of Suddenlink's proprietary information being leaked or shared with a direct competitor. [Arbaugh Decl. ¶ 22; Exhibit 14]

**PLAINTIFF'S RESPONSE:** Plaintiff admits that Arbaugh made certain conclusions. However, Plaintiff disputes Arbaugh's conclusions were based on the evidence of her investigation. Further, Arbaugh's belief that Plaintiff's relationship posed a risk of Suddenlink's proprietary or confidential information being leaked is unreasonable when Arbaugh acknowledged that Plainitff was allowed to keep access to Suddenlink's proprietary information between August 25th and September 28, 2017 while she conducted her investigation. [See Arbaugh 187:2-8]

Respectfully submitted this the 11th day of January, 2021.

The Law Offices of Oliver & Cheek, PLLC

By:     s/Ciara L. Rogers
        Ciara L. Rogers
        N.C. State Bar No. 42571
        Post Office Box 1548
        New Bern, NC  28563-1548
        Telephone: (919) 987-2024
        Facsimile: (252) 633-1950
        Email:  ciara@olivercheek.com
        *Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Ciara L. Rogers, Post Office Box 1548, New Bern, North Carolina 28563, certify:

That I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age;

That on the 11th day of January, 2021, I served copies of the foregoing pleading on the parties listed below via CM/ECF.

I certify under penalty of perjury that the foregoing is true and correct.

This the 11th day of January, 2021.

The Law Offices of Oliver & Cheek, PLLC

By:   <u>s/Ciara L. Rogers</u>
       Ciara L. Rogers
       N.C. State Bar No. 42571
       PO Box 1548
       New Bern, NC 28563-1548
       Telephone: (919) 987-2024
       Facsimile: (252) 633-1950
       Email: ciara@olivercheek.com
       *Attorney for Plaintiff*

To:
Ann H. Smith, Esq.     (via CM/ECF)
*Attorney for Defendant*