IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:19-CV-30-BO

| | |
|---|---|
| STAN C. STANLEY, | ) |
|     Plaintiff, | ) ) ) |
| v. | )     O R D E R ) ) |
| UNIVERSAL CABLE HOLDINGS, INC., d/b/a SUDDENLINK COMMUNICATIONS, | ) ) ) ) |
|     Defendant. | ) ) |

This matter is before the Court on defendant's motion for summary judgment. Plaintiff has responded in opposition and the matter is ripe for disposition. Also on the docket are three motions to seal. For the reasons that follow, defendant's motion for summary judgment is denied in part and granted in part, and the motions to seal are granted.

BACKGROUND

In July 2000 or 2001, plaintiff began working with a predecessor of defendant, a subsidiary of Altice USA that specializes in cable television, high-speed internet, broadband phone, home security, and advertising for residential and commercial customers. DE 41 ¶¶ 2, 4; DE 48, ¶ 4. Plaintiff was promoted to the position of sales engineer in February 2008, and he held that position until his termination. *Id.* at ¶ 5. In 2015, plaintiff began reporting to Mr. Sam Smith. *Id.* at ¶ 7. Around the same time, defendant hired Ms. Tracy Fryer Williams as an account executive. *Id.* at ¶ 8. Ms. Williams was supervised by Mr. Michael Tarrant, who also supervised account executives Ms. Sherry Cooper, Ms. Casey Bailey, and Mr. Aaron Penny. *Id.* at ¶¶ 8–9. Plaintiff and Mr. Chris

Manning, project development manager, provided the account executives with sales support. *Id.* at ¶ 10.

During her employment with defendant, Ms. Williams made multiple complaints to defendant's human resources department regarding her treatment, specifically complaining that her co-workers and supervisor did not like her, that she was "bullied" and "harassed" by them, and that accounts were stolen from her and sales leads were unfairly distributed. *Id.* at ¶ 11. Plaintiff also alleges that Ms. Williams complained that Mr. Tarrant was sexually harassing her. *Id.* Although plaintiff encouraged Ms. Williams to report Tarrant's comments to Ms. Williams about "personal things," such as whether she was dating anyone or whether she had ever dated a married man, he never reported this conduct to human resources. *Id.* at ¶ 12. Instead, plaintiff complained to Mr. Tarrant that Ms. Cooper and Ms. Bailey were "harassing" Ms. Williams, and he specifically reported that Ms. Cooper and Ms. Bailey were making "ugly" and profane comments about Ms. Williams's work abilities. *Id.* at ¶ 13–14. After his initial complaint, plaintiff continued to report to Mr. Tarrant issues with the way Ms. Cooper and Ms. Bailey treated Ms. Williams, and he complained to Mr. Tarrant that Ms. Cooper and Ms. Bailey tried to take work from Ms. Williams and made "not very nice, not positive statements" about Ms. Williams. *Id.* at ¶¶ 15–16.

Plaintiff was interviewed by defendant's human resources department as part of its investigation into Ms. Williams's complaints. *Id.* at ¶ 19. He alleges that, as a result, he suffered from retaliation that included others making unprofessional comments about him behind his back, being excluded from sales meetings, being prevented from joining sales calls, and having his office moved. *Id.* at ¶ 20. He also allegedly had rumors started about his relationship with Ms. Williams, was accused of being lazy and unwilling to work with others, was falsely accused of attacking a co-worker, and was threatened with being fired. DE 47, ¶ 14. Plaintiff further alleges that Mr.

2

Manning was treated similarly after also being interviewed by human resources representatives. DE 48, ¶ 23; DE 47, ¶ 13. Plaintiff states that a human resources representative had shared the statements made by plaintiff and Mr. Manning during the investigation. *Id.* According to Mr. Tarrant, plaintiff and Mr. Manning both had their offices moved so that the sales team could have better access to them. DE 48, ¶ 24. Ms. Williams's employment was subsequently terminated, and defendant told her this was because she repeatedly failed to meet her sales quota. *Id.* at ¶ 25. A month after her termination, Ms. Williams began working as a sales executive for CenturyLink, a direct competitor of defendant, and plaintiff kept in touch with her. *Id.* at ¶ 27; DE 47; ¶ 21. After Ms. Williams's termination, plaintiff was allowed to participate in some sales meetings and related telephone conferences, but sales representatives continued to exclude plaintiff from new quotes and installations. DE 1, ¶ 38. Plaintiff was also asked to start submitting records of his work to Mr. Smith, which he had not previously been required to do and which no other sales engineer was required to submit. *Id.*; DE 47, ¶ 20.

Plaintiff requested a call be scheduled to discuss project costs for a bid for Beaufort Count Schools, which had requested proposals for an E-rate project for the school system. DE 48, ¶¶ 30–31, 33. This proposal was one of the most complex and competitive opportunities that defendant competed for yearly. *Id.* at ¶ 32. Mr. Dedric Stanton, an employee of defendant, set up the call for August 25, 2017 using Microsoft Lync, a software program defendant used to organize and manage participation in conference calls and that permits invitees to participate by using a dial-in number and conference code or by connecting via an online link. *Id.* at ¶¶ 30, 34–35. Only employees of defendant were invited to the meeting. *Id.* at ¶ 36. Mr. Manning, who was on the call, separately called plaintiff, who was not in his office, to ensure his attendance on the call. *Id.* at ¶ 39. Plaintiff told Mr. Manning that he would join the call, and he then got into his car, joined

3

the call, and drove to Mr. Manning's office, where he completed the call. *Id.* After the call, Ms. Cooper and Mr. Penny reported to their supervisor, Mr. John Autry, that they had observed Williams's name on the conference bridge and, at Mr. Autry's request, provided a written statement. *Id.* at ¶¶ 41–42. Mr. Autry reported this information to his supervisor, Michael Shaffer. *Id.* at ¶ 43.

According to defendant, Mr. Smith received an email on August 28 from Mr. Steve Tulloh, Mr. Shaffer's supervisor, requesting that Smith obtain information from plaintiff related to the August 25 phone call. *Id.* at ¶ 45. During a subsequent conversation, plaintiff reported that Mr. Penny had sent him an "inappropriate" message of male genitalia to his work cell phone on August 21. *Id.* at ¶ 46; DE 47, ¶ 25. Plaintiff alleges that he had verbally complained to Mr. Autry when the video was sent. DE 48, ¶ 49. He also complained about a second text message Mr. Penny had sent, which plaintiff did not notice until August 25 and assumed had already been reported to human resources by someone else who had witnessed the exchange. *Id.* at ¶ 49. The issue was escalated to defendant's human resources department. *Id.* at ¶ 50.

Ms. Duska Arbaugh, regional director of human resources, was tasked with investigating the August 25 call and plaintiff' complaint about Mr. Penny's text messages. *Id.* at ¶ 52. On August 30, 2017, Mr. Autry spoke with Mr. Penny regarding plaintiff's complaint about the messages. *Id.* at ¶ 53. Mr. Penny admitted to showing the video to Mr. Manning and plaintiff on the morning of August 21, 2017 and then sending the video to plaintiff's work phone. *Id.* at ¶¶ 55, 59. Mr. Penny acknowledged his behavior was inappropriate and committed to not participating or being involved in the type of behavior moving forward. *Id.* at ¶ 60. Following the investigation, Mr. Penny received a corrective action for sharing inappropriate material in the workplace, and plaintiff did not receive any disciplinary action. *Id.* at ¶¶ 63–64.

4

As part of her investigation into the call, Ms. Arbaugh requested the cell phone records dating August 4 through August 30, 2017 for the company-issued cell phones of all participants on the August 25 call. DE 47, ¶ 40. Ms. Arbaugh subsequently made a second record for requests for records only for plaintiff's company-issued cell phone. *Id.* at ¶ 41. According to Ms. Arbaugh's testimony, Ms. Arbaugh calculated 889 minutes of talk time between plaintiff and Ms. Williams over a two-week period. DE 48, ¶ 67. Plaintiff and Williams spoke three times on August 25, the day of the call. *Id.* at ¶ 68. Ms. Arbaugh also requested email and instant message searches, badge swipe information, and explored whether defendant could verify plaintiff's location through GPS information. *Id.* at ¶ 70. Also as part of the investigation, Ms. Arbaugh allegedly interviewed all call participants, for a total of nine people, during the investigation. DE 47, ¶ 42. Six of these people said they did not recall seeing Ms. Williams's name on the participant list or hearing Mr. Penny say that Ms. Williams's name was on the participant list, and one person stated that anyone could have the conference call dial-in instructions because Mr. Staton used the same instructions for every call he set up. *Id.* Mr. Autry and Mr. Penny presented a screenshot of the participant list from the call with the number (252)689-2402 listed as a participant. *Id.* at ¶ 38. Mr. Autry alleged that a search of that telephone number on whitepages.com said the telephone number was owned by or associated with "Williams T Fryer," but a search of whitepages.com during Mr. Autry's deposition provided no information regarding who the number was owned by or associated with. *Id.*, ¶ 39.

Following her investigation, Ms. Arbaugh prepared a report concluding there was reasonable suspicion to believe that plaintiff either provided the call-in number to Ms. Williams or that plaintiff was with Ms. Williams during the call. DE 48, ¶ 79. Defendant's employee handbook explicitly prohibits employees from sharing confidential information, and employees

5

who violate this policy are subject to disciplinary action, including immediate termination. *Id.* at ¶ 80. Plaintiff maintains that the purpose of the call was not to discuss confidential and proprietary trade secret information, and that Williams could not benefit from information about defendant's E-rate bid. *Id.* at ¶ 44, DE 47, ¶ 32. Plaintiff's employment was terminated on September 28, 2017, but he was not given a reason for the decision at that time. *Id.* at ¶ 46.

On October 3, 2017, plaintiff filed a timely, *pro se* charge of discrimination with the Equal Employment Opportunity Commission (EEOC). DE 1-1. In particular, plaintiff alleged that he was "sexually harassed" in August 2017 and discharged in September 2017, referencing the incident with Mr. Penny. *Id.* at p. 1. Plaintiff also mentions his participation in an "internal investigation" and provides examples of alleged sexual harassment committed by Mr. Penny and Mr. Autry in the EEOC charge. *Id.* at p. 2. The EEOC investigated and mailed plaintiff a Right to Sue letter on December 3, 2018. DE 1, ¶ 10.

In March 2019, plaintiff initiated this action, bringing three causes of action under Title VII of the Civil Rights Act of 1964: (1) disparate treatment on the basis of gender, (2) hostile working environment, and (3) retaliation. *Id.* at ¶¶ 49–69. In response, defendant partially moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on April 29, 2019. DE 10. On July 8, 2019, this Court granted defendant's partial motion to dismiss, dismissing the discrimination and hostile work environment claims. DE 19. Defendant now seeks to dismiss the sole remaining claim for Title VII retaliation. DE 39.

## DISCUSSION

A motion for summary judgment may not be granted unless there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). In determining whether a genuine issue of material fact exists, a court must view the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

To state a Title VII retaliation claim, "plaintiff must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Only those retaliatory actions which are "materially adverse" such that they "might have dissuaded a reasonable worker" from engaging in protected activity are actionable. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Plaintiff claims he engaged in protected activity in three different instances: 1) when he participated in defendant's investigation into complaints of discrimination and harassment made by Williams; 2) when he reported discrimination and retaliation by Ms. Cooper, Ms. Bailey, and Mr. Tarrant against him; and 3) when he reported sexual harassment by Mr. Penny. He alleges that he faced retaliation in two

7

forms: 1) harassment beginning after he participated in defendant's investigation and 2) termination.

The Court looks at plaintiff's claim as to his termination first. If plaintiff has established a prima facie case, it may be rebutted by his employer by a showing of a legitimate, nondiscriminatory reason for the adverse employment action. *Equal Emp't Opportunity Comm'n v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Defendant can meet this burden by "offering admissible evidence sufficient for the trier of fact to conclude" that this nondiscriminatory conduct was the reason for the termination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The burden then lies with plaintiff to show that his employer's proffered legitimate reasons are merely pretext for discrimination. *Id.* at 143. Plaintiff may prove pretext by showing that the alleged nondiscriminatory explanation for termination "is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (internal quotations omitted). At the pretext stage, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (internal quotations omitted).

Assuming plaintiff has established a prima facie case of retaliation, his claim of retaliation as to his termination must still fail because defendant has articulated a legitimate non-retaliatory reason for terminating plaintiff. Defendant asserts that plaintiff's employment was terminated because, after conducting a thorough investigation, defendant suspected that plaintiff had shared confidential and proprietary information with a former employee who was then working with a competitor. Plaintiff denies he engaged in this alleged conduct and he disagrees with defendant's decision to terminate his employment, but this Court must not consider whether defendant made

8

the correct decision in terminating plaintiff. *Villa v. CazaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (citation omitted) (this Court is not "a kind of super-personnel department weighing the prudence of employment decisions"). Instead, this Court asks only whether defendant truly terminated plaintiff because it suspected him of sharing confidential and proprietary information. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (citation omitted) ("When an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.").

The Court finds that this was the case here. Plaintiff has not proffered any evidence, other than his own disagreement with defendant's decision, to show that defendant's suspicion that plaintiff shared confidential and proprietary information was not the reason for his termination. Instead, defendant conducted a thorough investigation, which included searches of cell phone records, email and instant message searches, badge swipe information searches, interviews, directory searches, and review of screenshots, that concluded that plaintiff had likely shared confidential information. Defendant has provided a good faith basis for believing that plaintiff engaged in misconduct, *Villa*, 858 F.3d at 903 ("If [plaintiff] was fired for misconduct [he] did not actually engage in, that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made."), and no reasonable juror could believe that defendant was motivated by retaliatory animus rather than by a suspicion that plaintiff was sharing confidential and proprietary information.

Finally, plaintiff cannot rebut this legitimate non-retaliatory reason for termination by showing pretext. Plaintiff has not presented any evidence which casts doubt on the fact that defendant reasonably believed plaintiff shared confidential, proprietary information with a former

9

employee then working for a competitor. All plaintiff can do is state that he did not engage in the alleged conduct, but pretext is still absent even if defendant was mistaken about plaintiff's conduct. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007). Plaintiff only speculates that defendant's real reason to terminate his employment was retaliation, but he has not provided sufficient evidence to support a plausible inference that defendant's decision to terminate his employment was based on his engagement in protected activity. To the extent that plaintiff relies on the temporal proximity between the termination and protected activity, this is insufficient in light of plaintiff's lack of other evidence. *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993) (finding that plaintiff cannot rely solely on temporal proximity to show pretext). Plaintiff's attempts to discredit the investigation also fail. Plaintiff's argument that defendant conducted a sham investigation is not supported by the undisputed facts, and plaintiff even stated during the investigation that he "knew [the information collected] looked bad." DE 42-6, ¶ 22. Furthermore, the fact that the investigation may not have been as thorough as plaintiff would have like or reached a result plaintiff disagrees with cannot establish pretext. *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011). In conclusion, the Court finds that plaintiff has failed to state a prima facie case of retaliation as to his termination.

Turning to plaintiff's allegations of harassment following his participation in defendant's investigation, the Court must first determine whether participation in defendant's investigation constituted protected activity. Title VII prohibits an employer from retaliating against an employee "for participating in an ongoing investigation or proceeding under Title VII" or taking "adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)). The first part is the participation clause, and the second part is known as the

opposition clause. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 274 (2009). The bar for what constitutes opposition is not high, and virtually any comment that disapproves of allegedly discriminatory workplace conduct is considered opposition to an unlawful employment practice. *Id.* at 276; *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). "[S\ection 704(a) protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." *Navy Fed.*, 424 F.3d at 406 (citations omitted).

Plaintiff alleges that both the opposition clause and participation clause are at issue in this case, since plaintiff advised Ms. Williams to report to human resources that she was being sexually harassed to the point of creating a hostile work environment and retaliated against and answered questions from defendant's human resources representatives related to Ms. Williams' complaints. Here, the Court finds that plaintiff engaged in protected activity with this behavior. A person can oppose an employer's discriminatory practices "by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on [his] own initiative but not one who reports the same discrimination in the same words when [his employer] asks a question." *Crawford*, 555 U.S. at 277–78. The Supreme Court has previously found that "[i]f it were clear law that an employee who reported discrimination in answering an employer's questions could be penalized with no remedy, prudent employees would have a good reason to keep quiet about Title VII offenses against themselves or against others." *Id.* at 279. Therefore, by participating in defendant's investigation, plaintiff opposed discrimination.

In the Fourth Circuit, employees are protected from retaliation when they oppose "a hostile work environment that, although not fully formed, is in progress." *Boyer-Liberto v. Fontainebleau*

11

Case 4:19-cv-00030-BO   Document 61   Filed 05/18/21   Page 11 of 15

*Corp.*, 786 F.3d 264, 282 (4th Cir. 2015). By making multiple complaints of harassment and retaliation to Mr. Tarrant and opposing the conduct Ms. Williams complained of when he was interviewed by defendant's human resources representatives, plaintiff complained of conduct he reasonably believed met the legal definition of harassment and retaliation, even if the hostile work environment was not fully formed. These complaints did involve violations of Title VII because plaintiff complained of questions Mr. Tarrant only asked Ms. Williams because of her gender, such as whether she was dating anyone and whether she had ever dated a married man. It is sufficient that plaintiff believed that Ms. Williams was being discriminated against because of her sex when he participated in the investigations into her complaints and opposed her discrimination.

Defendant has cited non-binding decisions that state that the participation clause only applies to reports through official channels and participation in formal investigations under Title VII, but not in internal investigations. However, the Fourth Circuit has found that "utilizing informal grievance procedures as well as . . . voicing one's opinions in order to bring attention to an employer's discriminatory activities" are protected activities under the opposition clause. *Laughlin*, 149 F.3d 253, 259. The Court finds that plaintiff's activities fall into this category, and that plaintiff engaged in protected activity even though he only participated in an internal investigation and made internal complaints.

Next, the Court finds that plaintiff was subjected to adverse actions because of his participation in protected activity. An adverse action under Title VII is one that "constitutes a significant change in employment status." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). An adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (citation omitted). However, the Supreme Court has noted that "[i]nterpreting the antiretaliation provision to provide broad

12

protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 67.

Specifically, plaintiff claims he was subjected, among other things, to others making unprofessional comments about him behind his back, being excluded from sales meetings and being kept from going on sales calls, and having his office moved. These allegations are sufficient to survive at the summary judgment stage. In considering whether actions such as exclusion from meetings are materially adverse, courts in the Fourth Circuit typically consider whether the action "had a negative effect on terms, conditions, or benefits" of employment. *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2004). Here, plaintiff alleges that defendant's job description for sales engineers specifically mentions sales engineers attending sales visits and sales meetings where sales visits are discussed and planned. Thus, a reasonable person could conclude that being left out of weekly sales meetings and being prevented from going on sales visits were essential components of plaintiff's job and therefore affected the terms, conditions, and benefits of his employment. The actions plaintiff complains of were not only committed by peers and co-workers, since Mr. Tarrant was plaintiff's direct supervisor and a management-level employee rather than a co-worker.

Finally, the Court finds that a reasonable person could find a causal connection between plaintiff's protected activity and the adverse actions he suffered. Defendant argues that plaintiff has not proffered any evidence suggesting a causal connection between his participation in the investigation of Ms. Williams's complaints and his complaints about his own treatment and the alleged retaliatory actions because plaintiff has not shown that defendant took any sort of retaliatory action as a result. The Court disagrees. According to the Fourth Circuit, "[i]n retaliation cases, a causal connection may exist where the employer takes adverse employment action against

13

an employee shortly after learning of the protected activity." *Penley v. McDowell Cty. Bd. Of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017). If a supervisor, motivated by discriminatory or retaliatory animus, intentionally and proximately causes an adverse employment action, an employer may be held vicariously liable. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 418–22 (holding that "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable") (emphasis in original). Here, since plaintiff alleges that Mr. Tarrant, his supervisor, was involved in the adverse employment action, defendant can be held vicariously liable. A reasonable person could also find that there was sufficient temporal proximity to create a causal connection. In conclusion, the Court finds that plaintiff has established a prima facie case of retaliation following his participation in defendant's investigation.

## CONCLUSION

For the above reasons, defendant's motion for summary judgment [DE 39] is GRANTED in part and DENIED in part. Defendant's motion is granted as to plaintiff's claim of retaliation as to his termination, and it is denied as to the retaliation following his participation in defendant's investigation. Plaintiff's cause of action against defendant for retaliation may proceed as to defendant's allegation that he suffered harassment after participating in defendant's investigation into Ms. Williams's complaints. Furthermore, for good cause shown, the motions to seal [DE 44, 53, 59] are GRANTED.

SO ORDERED, this 17 day of May, 2021.

                                     TERRENCE W. BOYLE
                                     UNITED STATES DISTRICT JUDGE

15

Case 4:19-cv-00030-BO   Document 61   Filed 05/18/21   Page 15 of 15